**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AARON FLINT,
            *Plaintiff-Appellant,*

v.

GEORGE DENNISON, in his official
capacity as President of the
University of Montana-Missoula
(UMT); ASSOCIATED
STUDENTS OF THE UNIVERSITY OF
MONTANA (ASUM); KYLE
ENGELSON, in his official capacity
as the ASUM Elections
Committee Chair; JUSTIN BAKER;
AVERIEL WOLFF; SOPHIA ALVAREZ;
ANNA GREEN; KRIS MONSON;
DEREK DUNCAN; KATIE BOECKX, in
their official capacities as
Elections Commissioners for the
Associated Students of UMT;
JESSICA ADAM,
            *Defendants-Appellees,*

and

GALE PRICE, President; VINNIE
PAVLISH, ASUM Vice President;
CASSIE MORTON, ASUM Business
Manager, and ex-officio member
of ASUM Senate; BRYCE BENNETT;
ANDREW BISSELL; BRAD CEDERBERG;
TYLER CLAIRMONT; NEZHA
HADDOUCH; SHAWANA HAGEN;

No. 05-35441

D.C. No.
CV-04-00085-DWM

OPINION

CHRIS HEALOW; ANDREA HELLING;
DERF JOHNSON; BRITTA PADGHAM;
KIMBERLY PAPPAS; JOSH PETERS;
REBECCA PETTIT; JAKE PIPINICH;
ROSS PROPERI; JON SNODGRASS;
LESLIE VENETZ; NATHAN ZIEGLER;
CASEY HOGUE, in their official
capacities as ASUM Senators,
                              *Defendant.*

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
February 5, 2007—Seattle, Washington

Filed June 1, 2007

Before: Susan P. Graber, Richard A. Paez, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

**COUNSEL**

James Bopp, Jr., and Jeffrey Gallant, Bopp, Coleson & Bostrom, Terre Haute, Indiana, for the plaintiff-appellant.

David Aronofsky, Legal Counsel, The University of Montana, Missoula, Montana, and Lisa J. Danetz, National Voting Rights Institute, Boston, Massachusetts, for the defendants-appellees.

# OPINION

BEA, Circuit Judge:

We are called upon to decide whether the University of Montana may impose a dollar limit on what a student may spend on his campaign for student office. The University's limit did not affect *how* the money could be spent; rather, it directly told a student *how much* he could spend to get elected. The Federal Election Campaign Act of 1971 could not tell James Buckley how much of his money he could spend to be elected a United States Senator. *Buckley v. Valeo*, 424 U.S. 1, 51-54 (1976) (per curiam). Why, then, may a state university tell students how much they may spend to be elected to student office? Because, unlike the exercise of state-wide political self-determination at a national level at issue in *Buckley*, the student election at issue here occurred in a limited public forum, that is, a forum opened by the University to serve viewpoint neutral educational interests but closed to all save enrolled students who carried a minimum course load and maintained a minimum grade-point average. These educational interests outweigh the free speech interests of the students who campaigned within that limited public forum.

When Aaron Flint was a student at the University of Montana, he twice exceeded the $100 campaign expenditure limit imposed on student candidates for positions in the Associated Students of the University of Montana ("ASUM"). Following the second violation, Flint was denied a seat as ASUM Senator. Flint sued ASUM, the University, and ASUM officers, claiming the spending limit, as applied, violated his First Amendment right to freedom of speech. Flint now appeals the district court's order of summary judgment in favor of defendants. The precise question before us is this: Does the Speech Clause of the First Amendment to the United States Constitution prohibit a public university from imposing a $100 expenditure limit on candidates running for a position in student government? U.S. Const. amend. I ("Congress shall make no

law . . . abridging the freedom of speech . . . .”). We conclude that it does not.

## I.

## A.

The University of Montana is a public university under the Montana Constitution; it is administered through a Board of Regents. Mont. Const. art. X, § 2. The Board of Regents requires that the University’s student government organization meet certain requirements. For instance, the student government must follow all Board policies, and the student government’s constitution must be approved by the president of the University.

ASUM is the student government at the University of Montana. ASUM is a “representative body of the members of the Association, organized exclusively for educational and non-profit purposes.” ASUM Const. art. 2, § 1, *available at* http://www.umt.edu/asum/government/constitution.htm. Under its constitution, ASUM’s “primary responsibility . . . is to serve as an advocate for the general welfare of the students.” *Id.* ASUM “government and activities” must “comply with Montana State law and the policies of the Montana Board of Regents on Higher Education.” *Id.* § 4. All students at the University registered for seven or more credits during the Fall and Spring semesters are assessed an activity fee, and each student who pays this fee is a member of ASUM. *Id.* art. 1, § 2.

ASUM not only serves to represent the students at the University but also provides hands-on, practical educational opportunities for University students. As explained by ASUM’s senior faculty advisor,

> ASUM offers students experience in many forms of
> leadership, through which they develop a variety of

skills to handle the responsibilities that arise in student government. ASUM senators and executives learn how to address conflicting interests of diverse constituencies, how to make recommendations about the allocation of budgetary resources, how to negotiate with administrators over matters such as tuition and fee increases, and how to draft policies and priorities for numerous student programs.

Since ASUM's inception in 1906, the University has viewed ASUM as an invaluable educational tool for students of the University. ASUM exists, according to its senior faculty advisor, for "essentially educational purposes."

Consistent with its goals of representing the students at the University and providing students with leadership opportunities, ASUM allows for the election of three student executives and twenty student senators. ASUM Const. art. 4, § 1(a) Article 7 of the ASUM Constitution and Article 4 of the ASUM Bylaws impose several procedures and restrictions on the student election process. For example, only ASUM members, i.e., Student Activity Fee-paying students of the University, who maintain at least a 2.0 cumulative grade point average are eligible to run for elected office. *Id.* art. 7, § 1. Students must be registered for at least one credit to vote in any ASUM election. *Id.*

The ASUM Bylaws broadly regulate campaigning, which is defined as "any activity which directly or indirectly promotes the candidacy of one or more individuals for office." ASUM Bylaws art. V, § 2.A, *available at* http://www.umt.edu/asum/government/bylaws.htm. The Bylaws provide that on campus campaign materials may be displayed only after the official campaigning period begins and only in certain areas. *Id.* §§ 2.B-C, 2.F.2-4. The Bylaws further prohibit any door-to-door campaigning in University residence halls or family housing and condition campaigning in a classroom on the permission of the professor. *Id.* § 2.E.

At issue in the case at bar is the Bylaws' campaign expenditure limitation: $100 for individual candidates for office. *Id.* § 2.G.1-3. The Bylaws require each student candidate to document and make public his expenditures two days prior to the general election. *Id.* § 2.H. ASUM reimburses candidates for a portion of their expenditures. *Id.* § 2.G.4. The Bylaws prescribe that all contributions to campaigns come from students; corporate and political action committee contributions are prohibited, as are contributions from ASUM-sponsored organizations. *Id.* § 2.G.5, I. As a means of enforcing these campaign regulations, the Bylaws provide that any candidate who violates the election rules may be barred from candidacy or denied office.

## B.

With this general background in place, we turn to the facts of this case. Flint ran for and won election on a joint ticket with Gale Price as ASUM President and Vice-President, respectively, for the 2003-2004 academic year. Flint and Price combined to spend about $300 on their campaign and failed fully to disclose these expenditures as required by the ASUM Bylaws. The ASUM Senate censured both Flint and Price for exceeding the campaign expenditure limit but allowed them to retain their offices as ASUM President and Vice-President.

The following year, Flint ran for a term as ASUM Senator and again exceeded ASUM's spending limit. Upon submitting his campaign expenditure form on April 26, 2004, in which Flint reported expenditures of $214.69, Flint was informed by ASUM Elections Chairman Kyle Engelson that Flint's name would be removed from the ballot for the upcoming election. Flint, then ASUM President, responded to Engelson's letter with an email in which he noted ASUM procedures require a two-thirds vote of the Senate approving Engelson's recommendation, which would not be possible until the election was already underway. Flint suggested that Engelson recommend to the Senate that candidates who violated ASUM election

laws not be allowed to take office. After the election was underway, the ASUM Senate voted to remove Flint from his Senate seat should he win. Accordingly, after Flint received enough votes to be elected ASUM Senator, he was denied office.

Flint filed a complaint in United States District Court on May 5, 2004, under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, claiming that the ASUM Bylaws's $100 spending cap on campaign expenditures was an unconstitutional abridgment of free speech. Flint sued George Dennison, in his official capacity as the University president; ASUM; Kyle Engelson, in his official capacity as ASUM Elections Committee Chair; and seven ASUM Elections Committee Members in their official capacities. Flint later filed an amended verified complaint adding Gale Price, then ASUM President, two ASUM Executive Officers in their official capacities, and twenty ASUM Senators in their official capacities (collectively referred to hereinafter as "defendants").

Flint also filed a motion for a temporary restraining order, a motion for a preliminary injunction, and a motion to consolidate the preliminary injunction hearing with the trial on the merits. The district court denied Flint's motions. Before the court rendered its judgment as to Flint's motion for preliminary injunction, defendants filed a motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(b)(7). Following the court's denial of a preliminary injunction, Flint then filed an amended verified complaint to which the defendants again filed a 12(b)(1) and 12(b)(6) motion to dismiss. Thereupon, the district court issued an order to show cause regarding additional briefing and argument. Flint requested further briefing and argument to resolve the issue as to whether strict scrutiny[1] or rational rela-

---

[1]Under a strict scrutiny analysis, government is required to show that its regulation of speech "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)

tionship[2] applied to test the constitutionality of the campaign expenditure limitations. Defendants responded that additional briefing or argument was not needed and suggested that if the court chose to refer to matters outside the pleadings to resolve the 12(b) motion, the court should convert it to a Rule 56 motion for summary judgment based on the record developed in connection with the motion for preliminary injunction. The district court accepted defendants' suggestion and, applying a rational relationship standard to the spending cap, issued an order and opinion granting summary judgment to defendants on March 28, 2005.

Flint timely appealed that order. He claims that the district court applied the wrong legal standard in determining the constitutionality of ASUM's regulations. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## II.

Before turning to the merits of Flint's appeal, we first consider two threshold issues: whether Flint's claims are moot as a result of Flint's graduation from the University of Montana and whether the Eleventh Amendment immunizes defendants from Flint's suit.

## A.

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.' " *Massachusetts v. EPA*, 127 S. Ct. 1438, 1452 (2007); *see also DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1860-61 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing

---

[2]Under a rational relationship analysis, government may regulate speech "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 46.

so."). A case that "has lost its character as a present, live controversy" is moot and no longer presents a case or controversy amenable to federal court adjudication. *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (explaining that the mootness doctrine derives from the requirement of an Article III case or controversy). A cause of action is moot when the issues " 'are no longer "live" or the parties lack a legally cognizable interest in the outcome' " of the litigation. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of L.A. v. Davis*, 440 U.S. 625, 631 (1979)). Mootness, however, is a flexible justiciability doctrine that allows review "if there are present effects that are legally significant." *Jacobus v. Alaska*, 338 F.3d 1095, 1104 (9th Cir. 2003); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 400 (1980) (explaining that the Court's "cases demonstrate the flexible character of the Art. III mootness doctrine"). Where a court retains the ability to " 'fashion some form of meaningful relief' " between the parties, an appeal is not moot, and the court retains jurisdiction. *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1000 (9th Cir. 2004) (quoting *In re Pattullo*, 271 F.3d 898, 901 (9th Cir. 2001) (order)).

[1] Here, although Flint filed his lawsuit prior to his graduation, we must consider whether Flint's 2004 graduation from the University of Montana renders his cause of action seeking declaratory and injunctive relief against defendants moot. *See Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 127 S. Ct. 1484 (2007); *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) ("Mootness inquiries . . . require courts to look to changing circumstances that arise after the complaint is filed . . . ."). Generally, once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy, and his case is therefore moot. *See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (en banc). When a student's record contains negative information derived from

allegedly unconstitutional school regulations, however, that information may jeopardize the student's future employment or college career. *Hatter v. L.A. City High Sch. Dist.*, 452 F.2d 673, 674 (9th Cir. 1971). So long as a former student's record contains evidence of disciplinary sanctions, and the former student seeks "an order requiring school officials to expunge from school records all mention of the disciplinary action," the action is not moot. *Id.*

[2] Here, Flint's amended complaint sought such an order of expungement. Flint sued for (1) a declaration that ASUM's limitation on campaign expenditures violated his free speech rights, (2) an injunction preventing ASUM from removing him from his elected position on the ASUM Senate, and (3) an injunction ordering ASUM to remove from his record "all findings, proceedings, recommendations, and actions taken as a result of" the election code violations. Consequently, despite Flint's graduation from the University in 2004, his controversy remains "live" because of his third claim for relief. Given that mootness, unlike standing, is a flexible justiciability doctrine, *see Jacobus*, 338 F.3d at 1104, we retain the ability to grant relief in a legally significant way—to wit, ordering the expungement from Flint's record all evidence of his 2003 censure and the 2004 denial of his ASUM Senate seat. Such expungement is certainly a " 'form of meaningful relief.' " *Dream Palace*, 384 F.3d at 1000 (quoting *Pattullo*, 271 F.3d at 901). If we were to determine that Flint's First Amendment rights were violated, declaratory relief would require the University to expunge any and all records of Flint's censure and Senate seat denial; therefore, we hold that Flint's case is not rendered moot by his graduation.[3]

---

[3]This case is distinguishable from *Students for a Conservative America v. Greenwood*, 378 F.3d 1129 (9th Cir. 2004). There, we found the expungement exception inapplicable despite the students' request for expungement because the university did not keep records of election code violations. *Id.* at 1131. There was also no evidence in that case that the students were censured. In contrast, Flint was censured by ASUM, a

**B.**

**[3]** Having determined that Flint's claims are not moot, we now consider whether defendants are entitled to immunity under the Eleventh Amendment. The Eleventh Amendment limits § 1983 claims such as Flint's. In *Will v. Michigan Department of State Police,* 491 U.S. 58, 70 (1989), the Supreme Court held that "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes" are not "persons" under § 1983. Moreover, *Will* clarified that "a suit against a state official in his or her official capacity . . . . is no different from a suit against the State itself." *Id.* at 71. We have held that a state university is an arm of the state entitled to Eleventh Amendment immunity. *See, e.g.*, *Armstrong v. Meyers*, 964 F.2d 948, 949-50 (9th Cir. 1992) (per curiam). Therefore, state officials sued in their official capacities, including university officials, are not "persons" within the meaning of § 1983 and are therefore generally entitled to Eleventh Amendment immunity.

**[4]** *Will* recognized one vital exception to this general rule: When sued for prospective injunctive relief, a state official in his official capacity *is* considered a "person" for § 1983 purposes. *Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985))). This exception recognizes the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), that a suit for prospective

school organization, in 2003 and denied his Senate seat in 2004 as is memorialized in ASUM Senate Meeting Minutes of April 28, 2004. Further evidence includes correspondence memorializing Flint's violation of the spending limit in 2004 from Kyle Engelson on behalf of the ASUM Senate. Furthermore, neither in its briefing nor during oral argument has the University rebutted Flint's assertion that it keeps records of Flint's 2003 censure and 2004 Senate seat denial.

injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity. *See Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1036 (9th Cir. 1999) ("*Ex Parte Young* provided a narrow exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities."); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 840 (9th Cir. 1997) ("[T]he Eleventh Amendment allows only prospective injunctive relief to prevent an ongoing violation of federal law.").

**[5]** Flint seeks declaratory and injunctive relief as related to past violations, namely, ASUM's allegedly unconstitutional infringement of his right to freedom of speech. However, as in *Doe v. Lawrence Livermore National Laboratory*, the relief Flint seeks is not so limited. In *Doe*, a contract university employee sought damages and reinstatement for breach of contract and a § 1983 violation after an alleged wrongful discharge. *Id.* at 837. The district court dismissed both claims as barred by the Eleventh Amendment, but we reversed the dismissal of the § 1983 claim, holding that reinstatement constitutes prospective injunctive relief because a wrongful discharge is a continuing violation. *Id.* at 841. Here, the injunctions Flint seeks as related to past violations serve to expunge from University records the 2003 censure and 2004 denial of his Senate seat, which actions may cause Flint harm. Thus, the injunctions sought are not limited merely to past violations: they serve the purpose of preventing present and future harm to Flint. Therefore, they cannot be characterized solely as retroactive injunctive relief and are not barred by the Eleventh Amendment.[4]

---

[4]Because we ultimately hold that ASUM's campaign expenditure limitations do not violate the First Amendment and therefore affirm the district court's grant of summary judgment to all defendants, we need not consider defendants' argument that the student defendants are not state actors.

### III.

Satisfied that this case presents a live legal controversy and that the Eleventh Amendment does not bar Flint's suit against defendants, we turn to the merits of Flint's claims. Because Flint appeals from the district court's order granting summary judgment in favor of defendants, we review de novo, viewing the facts in a light most favorable to Flint and drawing all reasonable inferences in his favor. *Scheuring v. Traylor Bros.*, 476 F.3d 781, 784 (9th Cir. 2007). Because neither party disputes the relevant facts, our analysis is focused on application of the correct legal principles to the facts before us. *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002).

### A.

The "speech" at issue in this case takes the form of a student candidate's spending during the election cycle for ASUM office. Because campaign expenditures implicate a student candidate's ability to convey his or her message to the University student body, the expenditures necessarily constitute "speech" and thus qualify for First Amendment protection. *See Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657 (1990) ("Certainly, the use of funds to support a political candidate is 'speech' . . . ."); *Buckley v. Valeo*, 424 U.S. 1, 19-20 (1976) (per curiam). There is no dispute in this case that *Buckley* and its progeny apply to the limited extent that they classify the student campaign expenditures as "speech" worthy of First Amendment protection.

**[6]** That ASUM campaign expenditures constitute speech is not, however, the end of the matter. The speech at issue occurred in the University of Montana student election system, and, subject to constitutional limitations, government has the power to control speech in its school election system to preserve the character of that system. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). "The existence of a right of access to public property and the

standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). In *Cornelius*, the Supreme Court reaffirmed that when examining government speech limitations, we are to examine the nature of the restriction: "[T]he Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." 473 U.S. at 800.[5]

Here, both parties eschew forum analysis as the proper framework within which to analyze Flint's claim that the campaign expenditure limitation violates the First Amendment: Flint points to *Buckley* while defendants point to *Widmar v. Vincent*, 454 U.S. 263 (1981). We disagree on the one point upon which the parties agree: their contention that traditional First Amendment analysis is inapplicable here. To demonstrate why we disagree, we briefly address each party's contention.

## B.

### 1.

On the one hand, Flint vigorously asserts that student

---

[5]That the ASUM student election system "is a forum more in a metaphysical than in a spatial or geographic sense" does not affect our analysis because the Supreme Court has made clear that forum analysis is equally applicable to both spatial and metaphysical fora. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995); *see also Cornelius*, 473 U.S. at 800-02 (rejecting contention "that a First Amendment forum necessarily consists of tangible government property" in applying forum analysis to a charitable contribution program); *Perry*, 460 U.S. at 46-47 (applying forum analysis to a school mail system) As more fully explained below, when the government opens a forum, such as a student election, the government retains the ability, within constitutional bounds, to limit the use of that forum to its intended purposes.

spending as part of the ASUM election is "political speech" that may be regulated only subject to strict scrutiny. Flint equates the ASUM student government to state and national government: "The role of the ASUM officers is no less important to society than is that of the Montana state government." Based on his equation of ASUM student leaders to elected political officials, Flint contends that *Buckley* is controlling and mandates that the ASUM campaign expenditure limitations be struck down as an unconstitutional limitation on speech.[6]

Flint's arguments are unpersuasive. We may not simply ignore the facts that the campaign expenditure limitations in this case involved election to *student government* and that the expenditures occurred mostly, if not exclusively, on a *university campus*. The educational context of a university, the specific educational purpose of ASUM student government, and the numerous other limits placed upon student campaigning distinguish the campaign expenditure limitations in this case from those in cases such as *Buckley*, which involved campaigns for national political office. Furthermore, while ASUM undoubtedly has an impact on students at the University and has certain powers to distribute funds among student groups, it simply does not follow that ASUM is akin to a political government or that the ASUM election is the equivalent of a congressional race. The ubiquity with which political government is present to control facets of our lives is not—thank Heavens!—replicated by student government in students' lives.

---

[6]In *Buckley*, the Supreme Court struck down portions of the Federal Election Campaign Act of 1971 that limited campaign expenditures on behalf of candidates in federal election campaigns on the ground that such limitations violated the First Amendment. 424 U.S. at 58-59. The Court held that the governmental interests advanced in support of expenditure limitations would need to satisfy strict scrutiny, and did not do so. *See id.* at 44-45."

The University uses ASUM primarily as an educational tool—a means to educate students on principles of representative government, parliamentary procedure, political compromise, and leadership. In contrast to participation in state or national politics, participation in ASUM student elections is limited to ASUM-enrolled University students—students must maintain at least a 2.0 grade point average to run for office and only students are allowed to vote in the election. Unlike state and national governments, ASUM is a creature of the Board of Regents, whose policy calls for ASUM's Constitution and conditions the validity of the constitution on the University president's approval. Indeed, ASUM's entire operation is subject to the Board of Regents' policies and campus policies.

Thus, given the nature of this student organization and the environment in which it exists and operates, ASUM student officeholders are not the equivalent of elected political officeholders. As the Eleventh Circuit explained in a case dealing with similar campaign limitations for student government, "this is a university, whose primary purpose is *education*, not electioneering. Constitutional protections must be analyzed with due regard to that educational purpose, an approach that has been consistently adopted by the courts." *Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.*, 867 F.2d 1344, 1346 (11th Cir. 1989). We should not apply the principles of *Buckley* without first considering whether the university setting affects our First Amendment analysis. *See Widmar*, 454 U.S. at 267 n.5.[7]

---

[7]In *Welker v. Cicerone*, 174 F. Supp. 2d 1055, 1065 (C.D. Cal. 2001), a district court in our circuit addressed a similar campaign expenditure limitation on a university campus and held that *Buckley* was controlling because the court found no difference between a student election and a political election: "The court sees no reason to distinguish between applying *Buckley* to state political elections and political elections at state universities." We see the several differences detailed above between ASUM's elections and state and national political elections and therefore have no trouble making such a distinction.

**2.**

We likewise disagree with defendants' position, and that of the district court, that the university setting dictates that we must defer to all reasonable decisions imposed on student speech during the election process rather than first engaging in a forum analysis. Relying on passages in *Widmar* that public universities have the right to determine "who may teach, what may be taught, how it shall be taught, and who may be admitted to study" and the right to "make academic judgments as to how best to allocate scarce resources," defendants assert that absent a showing of unreasonableness, the spending limits are *per se* constitutional because ASUM is an educational tool, and the University desires that leadership opportunities be available to as many students as possible. 454 U.S. at 276 (internal quotation marks omitted). We should defer, defendants contend, to their judgment in reasonably regulating speech regardless whether the regulation advances the purpose of the forum the University has provided for the speech.

We do not read the Supreme Court's cases to require such deference without first scrutinizing more carefully the nature of the student election forum and the government's interest in limiting speech within that forum. Although the Supreme Court in *Widmar* discussed the unique setting of a university campus, it also stressed that its "cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." 454 U.S. at 268-69. "The University's institutional mission, which it describes as providing a *secular* education to its students, does not exempt its actions from constitutional scrutiny." *Id.* at 268 (internal quotation marks and citation omitted). The Court looked to the nature of the property, explaining that the university in *Widmar* had "created a forum generally open for use by student groups" and therefore the university had "assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Id.* at 267.

**[7]** The Supreme Court has applied forum analysis in other, similar cases involving speech limitations on a university campus. In *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 828-30 (1995), the Supreme Court characterized a university student fund responsible for monetary reimbursements to student groups as a limited public forum. The Court then analyzed the student fund's denial of distributions to a university student religious group as viewpoint discrimination and subjected the denial to traditional First Amendment scrutiny. *Id.* at 830-37.[8] Likewise, in *Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 229-35 (2000), the Supreme Court ruled that a university activity fee charged to students, which fee was used to facilitate extracurricular student speech, was constitutional

---

[8]Of further relevance in *Rosenberger* is the Court's clarification of *Widmar*. Specifically, the Court explained that *Widmar*'s language regarding a university's freedom to make judgments as to allocation of scarce resources, language relied on by defendants here, is applicable to the university's own speech, but not to restrictions of third-party speech on a university campus:

> [In *Widmar*], in the course of striking down a public university's exclusion of religious groups from use of school facilities made available to all other student groups, we stated: "Nor do we question the right of the University to make academic judgments as to how best to allocate scarce resources." 454 U.S. at 270. The quoted language in *Widmar* was but a proper recognition of the principle that *when the State is the speaker, it may make content-based choices. . . .*

> It does not follow, however, and we did not suggest in *Widmar*, that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.

515 U.S. at 833-34 (emphasis added). We are presented in this case not with the speech of the University of Montana but with the speech of students involved in campaigning for student government. Here, it is Flint's spending of his own money that was regulated, not University funds or subsidies to Flint. Thus, contrary to defendants' assertions, *Widmar*'s reference to broad deference is not determinative.

so long as the university's funding support was viewpoint neutral.

**[8]** In sum, we conclude that the constitutionality of the campaign expenditure limitation depends on the nature of the forum and whether the limitation on speech is a legitimate exercise of government power in preserving the character of the forum.[9]

---

[9]Given that the speech at issue in this case is not "school-sponsored," *see supra* note 8, we need not consider whether the principles of *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), apply with full force in a university setting—a question neither we, *see Brown v. Li*, 308 F.3d 939, 957 (9th Cir. 2002) (Reinhardt, J., concurring in part and dissenting in part), nor the Supreme Court, *Hazelwood*, 484 U.S. at 273 n.7, have definitively answered. Our sister circuits are split on the question. *Compare Kincaid v. Gibson*, 236 F.3d 342, 352 (6th Cir. 2001) (en banc), *and Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.*, 868 F.2d 473, 480 n.6 (1st Cir. 1989) ("*Hazelwood* . . . is not applicable to college newspapers."), *with Hosty v. Carter*, 412 F.3d 731, 734-48 (7th Cir. 2005) (en banc) (applying *Hazelwood* to university context), *and Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.*, 867 F.2d 1344, 1346-47 (11th Cir. 1989) (same). *Hazelwood* addressed whether a high school was required affirmatively to promote particular speech by allowing the speech's inclusion in a school newspaper. 484 U.S. at 266-74. Here, we are presented with student campaign speech in a forum opened by the University. This is a scenario in which the University is not sponsoring, as in *Hazelwood*, any of the candidates' speech but is *allowing* the campaign-related speech.

We note that *Hazelwood* reinforces the conclusion that we must analyze the ASUM expenditure limitations within the confines of traditional forum analysis. In *Hazelwood*, the Supreme Court first determined that the high school student newspaper at issue was not a public forum for expression and concluded that in the specific setting of a high school, the school could "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Here, the University seeks to avoid the threshold question—namely, what type of forum is the ASUM election—and asks us to defer to its reasonable, educational related regulations. As shown, neither the Supreme Court's nor this court's precedents permit such avoidance.

## IV.

## A.

**[9]** Although the student campaign expenditures constitute speech protected by the First Amendment, "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius*, 473 U.S. at 799. Indeed, the Supreme Court has made clear:

> Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. . . . [T]he Government "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated . . . ."

*Id.* at 799-800 (citation omitted) (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976); *see also Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 906-07 (9th Cir. 2007). Accordingly, we apply a forum analysis to determine when the government has legitimate interests in restricting the use of a forum to certain intended purposes that outweigh a speaker's interest in using the forum for a different purposes. *Cornelius*, 473 U.S. at 800; *Faith Ctr.*, 480 F.3d at 907. "Forum analysis has traditionally divided government property into three categories: public fora, designated public fora, and non-public fora. Once the forum is identified, we determine whether restrictions on speech are justified by the requisite standard." *Faith Ctr.*, 480 F.3d at 907 (citation omitted).

On one end of the fora spectrum lies the traditional public forum, "places which by long tradition . . . have been devoted to assembly and debate." *Perry*, 460 U.S. at 45; *accord Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677

(1998). Next on the spectrum is the so-called designated public forum, which exists "[w]hen the government intentionally dedicates its property to expressive conduct." *Faith Ctr.*, 480 F.3d at 907. A designated public forum cannot exist in the absence of specific action on the part of the government. *Cornelius*, 473 U.S. at 802 ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse."). A content-based restriction on speech in a public or designated public forum is subject to strict scrutiny, requiring the state to show a compelling interest in the restriction that is drawn narrowly to meet that interest. *Perry*, 460 U.S. at 45. A content-neutral time, place, and manner restriction is permissible so long as it is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." *Id.*; *Faith Ctr.*, 480 F.3d at 907.

At the opposite end of the fora spectrum is the non-public forum. The non-public forum is "[a]ny public property that is not by tradition or designation a forum for public communication." *Faith Ctr.*, 480 F.3d at 907. We subject speech restrictions in a non-public forum to less-exacting judicial scrutiny: "[A]s long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view," the government may preserve the forum for its intended purposes. *Perry*, 460 U.S. at 46.

**[10]** The government is not left with only the two options of maintaining a non-public forum or creating a designated public forum; if the government chooses to open a non-public forum, the First Amendment allows the government to open the non-public forum for limited purposes. The "limited public forum is a sub-category of a designated public forum that 'refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics.' " *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001)

(alteration in original) (quoting *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999)); *see also Rosenberger*, 515 U.S. at 829 ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics."). But "[o]nce [a government] has opened a limited forum, . . . [it] must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829. Specifically, the government "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' " *id.* (quoting *Cornelius*, 473 U.S. at 806), "nor may [the government] discriminate against speech on the basis of its viewpoint," *id.*; *see also Faith Ctr.*, 480 F.3d at 907; *Cogswell v. City of Seattle*, 347 F.3d 809, 814 (9th Cir. 2003).

## B.

We conclude that the ASUM student election constitutes a limited public forum. While "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum," *Widmar*, 454 U.S. at 267 n.5, the forum in this case is not the University of Montana campus. Rather, because Flint challenges the limitations on speech within the confines of the ASUM election, whether the speech is delivered on campus or off, the relevant forum is the ASUM election itself, with its accompanying rules and regulations.[10] *See Cornelius*, 473 U.S. at 801 ("[I]n defining the forum we have focused on the access sought by the speaker."); *DiLoreto*, 196 F.3d at 965 ("The relevant forum is defined by the access sought by the speaker."). Although the ASUM election "is a forum more in a metaphysical than in a

---

[10]While the spending limit is found in the ASUM Bylaws, the limitation is nonetheless one imposed by the government on the forum. The University, as required by Board of Regents policy, has established ASUM as the associated student organization on the campus. Neither party disputes that the forum and the associated limitations are attributable to the University.

spatial or geographic sense," the forum analysis outlined above is equally applicable. *Rosenberger*, 515 U.S. at 830; *see supra* note 5.

The ASUM election is not a traditional public forum: unlike parks and streets, it has not "by long tradition or by government fiat" been "devoted to assembly and debate." *Perry*, 460 U.S. at 45; *see also Forbes*, 523 U.S. at 678 ("The Court has rejected the view that the traditional public forum status extends beyond its historic confines . . . .").

The ASUM election also is not a designated public forum. "To create a forum of this type, the government must intend to make the property generally available to a class of speakers." *Forbes*, 523 U.S. at 678 (internal quotation marks and citation omitted). "[G]overnment does not create a public forum by inaction or by permitting *limited* discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802 (emphasis added); s*ee also Planned Parenthood of S. Nev., Inc. v. Clark County Sch. Dist.*, 941 F.2d 817, 822 & n.5 (9th Cir. 1991) (en banc).

Here, the ASUM election provides for the selection of students to govern student affairs; the election does not provide University installations for outsiders to showcase ideas in general.[11] Thus, the ASUM election exists to allow campaigns for

---

[11]This is in contrast to *Widmar*, where the state university had "created a forum generally open for use by student groups," 454 U.S. at 267, by "routinely provid[ing] University facilities for the meetings of registered organizations," *id.* at 265. The ASUM election is akin, rather, to the forum in *Perry*. There, the Supreme Court rejected the contention that a school mail system was a designated public forum because "there [was] no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public." 460 U.S. at 47; *see also Forbes*, 523 U.S. at 680 (holding that a candidate debate was not a designated public forum because the station broadcasting the debate "reserved eligibility for participation in the debate to candidates" and made "determinations as to which of the eligible candidates would participate in the debate").

student office and to elect student representatives to ASUM leadership positions in order to provide student candidates a valuable educational experience. The ASUM Bylaws define campaigning "as any activity which directly or indirectly promotes the candidacy of one or more individuals for an office," including a candidate's personal appearances, the posting or publishing of advertisements, distribution of literature, lobbying voters, and the buying of votes with money, gifts, or alcohol. ASUM Bylaws art. V, § 2.A. While the Bylaws do not limit the *content* of campaign speech, the Bylaws certainly do not permit students or the general public to use the ASUM election system indiscriminately. *See Perry*, 460 U.S. at 47.

Thus, a careful review of the ASUM Constitution and the ASUM Bylaws shows the University's purpose of opening a limited public forum, in the form of the ASUM elections. *See Faith Ctr.*, 480 F.3d at 908 n.8 ("A limited public forum is a sub-category of the designated public forum, where the government opens a nonpublic forum but reserves access to it for only certain groups or categories of speech."); *Hopper*, 241 F.3d at 1074 (same); *DiLoreto*, 196 F.3d at 965 (same); *see also Rosenberger*, 515 U.S. at 829; *Ala. Student Party*, 867 F.2d at 1353 (Tjoflat, J., dissenting) (noting that regulations governing campaigns for student government at a university created a limited public forum). For example, a student's ability to participate in the forum as a candidate is selective and the standards are clear. To run for office, a student must be registered for seven or more credits during the fall and spring semesters, pay a student activity fee, and maintain at least a 2.0 cumulative grade point average. ASUM Const. art. 7, § 1. Only students registered for at least one credit are allowed to vote in the ASUM election. *Id.*

Furthermore, unmistakably clear standards govern campaigning within the forum. Under the ASUM Bylaws, campaign materials may be displayed only after the official campaigning period begins. *Id.* § 2.B. The Bylaws prohibit any door-to-door campaigning in University residence halls or

family housing. Campaign speech may occur in a classroom only with the consent of the professor. *Id.* § 2.E. Posters may be placed in residence halls only with the approval of the residence hall office and in the University Center only with the approval of the University Center office. *Id.* § 2.F.2, 3. On the University campus itself, campaign materials may be posted only on kiosks. *Id.* § 2.F.4. And, of course, student candidates are not allowed to spend more than $100 promoting their campaign. There is nothing in the ASUM Constitution or Bylaws, or the record before us, to suggest that these limitations, save the expenditure limitation, do not apply equally to all who participate in a student campaign, candidates and non-candidates alike. There is also no dispute that the University, through ASUM, applies these policies consistently. The spending limits have been in place since 1970, and Defendant Gale Price, who ran on a ticket with Flint in the 2003 election, was censured along with Flint for violating the spending limits. *See Hopper*, 241 F.3d at 1076 ("[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum.").

**[11]** In summary, the restrictions on who may participate as a candidate or voter, and the regulations of the manner in which the campaign is conducted, together demonstrate that the ASUM election constitutes a limited public forum. This forum exists solely to allow campaigns for ASUM student office and the election of student representatives, thereby providing an educational experience for the student candidates and student voters.

## C.

**[12]** We now apply this framework to analyze the constitutionality of the campaign expenditure limitation. We must analyze whether the expenditure limitation is viewpoint neutral and reasonable given the purposes of the forum. *Rosenberger*, 515 U.S. at 829; *Faith Ctr.*, 480 F.3d at 907; *Cogswell*, 347 F.3d at 814. Because government "must

respect the lawful boundaries it has itself set" in opening a limited public forum, any restriction on speech which is not viewpoint neutral or is unreasonable, fails constitutional scrutiny. *Rosenberger*, 515 U.S. at 829.

**1.**

Viewpoint neutrality is the requirement that government not favor one speaker's message over another's regarding the same topic. When "government has excluded perspectives on a subject matter otherwise permitted by the forum," the government is discriminating on the basis of viewpoint. *Faith Ctr.*, 480 F.3d at 912. If certain speech "fall[s] within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker." *Cogswell*, 347 F.3d at 815. The Supreme Court has been clear that viewpoint discrimination occurs when the government "denies access to a speaker *solely* to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806 (emphasis added); *see also Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 971 (9th Cir. 2002) (recognizing that "where the government is plainly motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum, it is regulating a viewpoint"). "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

**[13]** There is no dispute in this case that the spending limit applies equally to all ASUM student candidates, as do all other campaign restrictions. The district court was presented no evidence showing that the University, through the spending limit, is attempting to suppress a particular point of view in the context of the ASUM election. Conversely, as evidenced by Gale Price's censure, the record demonstrates that the spending limit is applied equally to all student candidates, regardless of their views.

This case stands in contrast to *Rosenberger* and *Good News Club v. Milford Central School*, 533 U.S. 98, 107-08 (2001), both of which involved viewpoint discrimination in a limited public forum. In *Rosenberger*, the Supreme Court found that by excluding funding to a student religious group solely because the religious group promoted a particular religious perspective, the university was discriminating in a limited public forum on the basis of that group's viewpoint. 515 U.S. at 829-37. Examining this holding in *Faith Center*, we explained that, "[b]ecause other student publications were free to discuss the topic of religion from a myriad of views other than the prohibited perspective, the University had discriminated on the basis of viewpoint." 480 F.3d at 913. Similarly, in *Good News Club*, the Supreme Court found viewpoint discrimination where a public school excluded a Christian club from meeting on the school's grounds while permitting nonreligious groups to meet at the school. 533 U.S. at 107-09. The religious club sought only "to address a subject otherwise permitted [in] the [limited public forum], the teaching of morals and character, from a religious standpoint." *Id.* at 109. Thus, exclusion of the religious group from the forum amounted to impermissible viewpoint discrimination.

**[14]** Here, no evidence suggests that the University's desire to limit student candidate spending results from a desire to suppress any student's viewpoint or that the limitation in any way suppresses a particular candidate's viewpoint. The $100 limit does not apply solely to vegetarians, pacifists and Marxists, but not to meat-eaters, bellicists and fascists. Neither does the limit apply to candidates who might wish to abolish student government or at least intercollegiate athletics, but not to servile apple-polishers of the status quo or "jocks." Thus, the campaign expenditure limitation does not constitute viewpoint discrimination.

Flint's contentions do not persuade us to hold otherwise. Flint argues that the campaign expenditure limitation constitutes viewpoint discrimination because the limitation

"[a]llow[s] noncandidate students, student associations and outside groups . . . to speak with unlimited volume while limiting candidate speech."

The candidate/non-candidate distinction, however, is based on the *status* of the speaker, not on the speaker's viewpoint. The Supreme Court has held that in a non-public (or limited public) forum the government may "make distinctions in access on the basis of subject matter and *speaker identity*." *Perry*, 460 U.S. at 49 (holding that allowing different access based on the status of one union as the exclusive representative for the school district was not viewpoint discrimination because it distinguished based upon status, not particular views) (emphasis added); *see also Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1009-10 (9th Cir. 2003) (noting that a statute restricting the political speech of Political Action Committees but not candidates or other participants did not discriminate by viewpoint). Here, the spending limit is directed at the student candidates because they are the focus of the forum's purpose. Whether such focus is reasonable to achieve that purpose is our next inquiry.

## 2.

**[15]** We are also satisfied that the candidate spending limit is reasonable. The reasonableness inquiry "focuses on whether the limitation is consistent with preserving the property [here the ASUM election] for the purpose to which it is dedicated." *DiLoreto*, 196 F.3d at 967; *see also Perry*, 460 U.S. at 50-51. Reasonableness is not the legal equivalent of narrow tailoring or least restrictive means; indeed, the government's chosen method to preserve the character of a limited public forum "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808; *accord Cogswell*, 347 F.3d at 817 ("[T]here is no requirement that a restriction in a limited public forum be narrowly tailored or the government's interest be compelling for a restriction to be reasonable."). So long as the government can reasonably jus-

tify its regulation on speech in the limited public forum in light of the purposes of the forum, the regulation passes constitutional muster.

**[16]** Since its inception, ASUM has been subject to the University of Montana's educational mission. ASUM's faculty advisor explained that ASUM exists for "essentially educational purposes." ASUM's Constitution declares that ASUM is "organized exclusively for educational and non-profit purposes." ASUM Const. art. II, § 1. The election of student representatives to ASUM leadership positions is designed to help further the educational purpose of ASUM. The evidence before us clearly shows that the University views the spending limitation as vital to maintain the character of ASUM and its election process as an educational tool, rather than an ordinary political exercise. ASUM's senior faculty advisor explained that the spending limit was adopted in the revised ASUM Constitution of 1969-1970 "as a measure intended to defend ASUM against being steered away from its properly educational goals." The "primary intent" of the spending limits is "to prevent student government's being diverted by interests other than ones educational." It is thus obvious that the purpose of imposing the spending limit on student candidates is to serve pedagogical interests in educating student leaders at the University.

We find that the spending limits reasonably serve this pedagogical aim. ASUM exists to teach students responsible leadership and behavior. Imposing limits on candidate spending requires student candidates to focus on desirable qualities such as the art of persuasion, public speaking, and answering questions face-to-face with one's potential constituents. Students are forced to campaign personally, wearing out their sho-leather rather than wearing out a parent's—or an activist organization's—pocketbook. Our conclusion is supported by the declaration of Gale Price, former ASUM President:

> Unlimited spending in ASUM elections also would change the nature of the election process as a learn-

ing experience. The spending limits mean that stu-
dents have to figure out no-cost or low-cost ways of
campaigning. They have to plan ahead to figure out
their strategy, rather than just dumping a lot of
money into advertising materials at the last minute.
They have to make decisions about allocating their
resources effectively. Without spending limits, the
well-off students would not have to face these con-
straints or make these kinds of decisions in the
course of running for ASUM.

The spending limitation is thus consistent with the purpose of
the limited public forum in providing student leaders an edu-
cational experience as they campaign for, and are elected to,
student government. *See DiLoreto*, 196 F.3d at 967.[12]

[17] Furthermore, it is reasonable for the University to con-
fine this spending limitation to student candidates. Because
the purpose of ASUM is to provide an educational experience
to those students who actively participate in the organization,
it is reasonable for the University to limit the campaign
expenditure limitation to student candidates. In *Perry*, where
several teacher unions received different levels of access to a

---

[12]Flint contends that the expenditure limitation teaches students "that
the First Amendment doesn't protect political speech [and] how not to
conduct elections in a free society." Aside from its obvious hyperbole, this
argument is not persuasive. So long as the purported educational goal of
the expenditure limitation—here, a lesson in strategy, campaigning, and
leadership—is reasonably capable of fruition, any additional "lessons" that
students like Flint might learn do not affect the reasonableness, and thus
the constitutionality, of ASUM's regulations. Furthermore, nothing in the
First Amendment requires universities to set up student elections to mimic
exactly political elections and political fund-raising. It is beyond dispute
that government may impose reasonable, viewpoint neutral restrictions
even on pure political speech in limited public forums. *See Ark. Educ.
Television Comm'n v. Forbes*, 523 U.S. 666, 678-83 (1998); *Cogswell*,
347 F.3d at 814-18 (finding voter pamphlets a limited public forum and
holding that a limitation on candidate's statements in voter pamphlets is
viewpoint neutral and reasonable in light of the purpose of the forum).

limited public forum, the Supreme Court explained that "[t]he differential access provided [the teacher unions] is reasonable because it is wholly consistent with the district's legitimate interest in 'preserv[ing] the property . . . for the use to which it is lawfully dedicated.' " 460 U.S. at 50-51 (alterations in original) (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129-30 (1981)). Here too, applying the spending limitation only to candidates helps preserve the nature of the ASUM election as an educational experience for those students actively participating therein. Even if not the best or most effective means of providing the student candidates the educational experience that the University seeks to provide through the ASUM elections, we are confident the spending limits reasonably serve the purpose of the forum. *See Cornelius*, 473 U.S. at 808. In a limited public forum, the First Amendment requires nothing more.

## V.

[18] By creating a student election process, the University of Montana has opened a limited public forum dedicated to allow campaigning for and election to leadership positions in student government. The University's purpose in opening such a forum is to provide student candidates and student voters a certain type of educational experience. We hold that imposing an expenditure limitation on student candidates is viewpoint neutral and serves to effectuate the purpose of the ASUM elections. We therefore affirm the district court's summary judgment in favor of defendants.

**AFFIRMED.**