**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

OSU STUDENT ALLIANCE; WILLIAM
ROGERS,

　　　　　*Plaintiffs-Appellants,*

　　　　　v.

ED RAY; MARK MCCAMBRIDGE;
LARRY ROPER; VINCENT
MARTORELLO,

　　　　　*Defendants-Appellees.*

No. 10-35555

DC No.
6:09 cv-6269 AA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, Chief District Judge, Presiding

Argued and Submitted
May 2, 2011—Portland, Oregon

Filed October 23, 2012

Before: A. Wallace Tashima, Carlos T. Bea, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Tashima;
Dissent by Judge Ikuta

12757

## SUMMARY

### Constitutional Rights/Freedom of Speech

The court of appeals reversed a judgment of the district court and remanded. The court held that allegations of facts that demonstrate an immediate supervisor knew about the subordinate violating another's federal constitutional right to free speech, and acquiescence in that violation, suffice to state free speech violations under the First and Fourteenth Amendments.

Appellant OSU Students Alliance, a registered student organization at Oregon State University, sued employees of the university's facilities department under the civil rights statute, 42 U.S.C. § 1983, alleging that the employees violated the students' rights to free speech, due process, and equal protection when the employees threw out newspaper bins belonging to the *Liberty*, a conservative student monthly. The university employees had taken action pursuant to an unwritten school policy that was unannounced and not enforced other newspapers on the campus, including the official school newspaper. The students claimed that the university's president and vice president knew that the facilities services director was applying the policy against them, and the officials did nothing to stop it.

After the students filed suit, the university adopted a written policy on newspaper bins. The district court dismissed some of the students' claims as moot in light of the new policy, dismissed the students' damages claims for failure to state a claim, and denied the students' leave to amend their complaint.

The students appealed.

[1] The circulation of newspapers is expressive conduct protected by the First Amendment. If the government wishes

to regulate the placement of newspaper bins in a public forum, it must do so according to established, content-neutral standards. **[2]** A designated public forum exists when the government intentionally dedicates its property to expressive conduct. **[3]** OSU's campus was at least a designated public forum. The state intentionally dedicated campus property to expressive conduct, thereby creating a designated public forum. **[4]** Accepting as true the allegations in the complaint, OSU's newspaper-bin policy was unwritten and, prior to its application against the *Liberty*, entirely unenforced. Therefore, the policy did not establish a consistent practice aimed at partially closing the campus to speech activities and, as a result, did not vitiate the codified designation of OSU's campus as a public forum.

**[5]** Restrictions on newspaper circulation in public fora are unconstitutional unless enforced according to established, content-neutral standards. **[6]** OSU's policy created no standards to cabin discretion through content or history of enforcement, and it set no fixed standard for a distinction between the official school newspaper and the *Liberty*. The policy's enforcement against the *Liberty* therefore violated the First Amendment.

**[7]** A speech restriction cannot be a valid time, place, manner restriction if it does not contain clear standards. The time, place, and manner test requires content neutrality. Whether OSU's unwritten policy was content-neutral could not be determined, because the policy did not disclose the basis on which it distinguished between publications. OSU's policy could not qualify as a valid time, place, and manner restriction.

**[8]** The students asserted that OSU violated the First Amendment by enforcing the policy in a viewpoint-discriminatory fashion. Under this theory, the complaint plausibly alleged that OSU officials applied the policy to quash the *Liberty*'s viewpoint, rather than on the basis of some unar-

ticulated, content- and viewpoint-neutral criterion. Hence, the allegations of the complaint sufficiently stated a non-neutral viewpoint restriction to speech in a designated public forum. **[9]** Thus, the complaint adequately pleaded a First Amendment violation on two grounds by applying a standardless policy to draw a distinction between the *Liberty* and the official paper and by engaging in viewpoint discrimination.

**[10]** Because the students' complaint properly alleged that the university infringed their speech rights by employing a standardless policy to draw a distinction between the *Liberty* and the official paper and by engaging in viewpoint discrimination, the complaint also stated equal protection claims for differential treatment that trenched upon a fundamental right. **[11]** The complaint adequately pleaded an equal protection violation.

**[12]** Due process generally requires that the government give notice before seizing property. However, the government need not give notice when the interest at stake is small relative to the burden that giving notice would impose. **[13]** The complaint adequately pleaded a due process violation. If the allegations were true, then OSU confiscated property without notice even though providing notice would have imposed, at most, only a minimal burden on OSU.

**[14]** Section 1983 suits do not support vicarious liability. To state a valid § 1983 claim, a plaintiff must plead that each government-official defendant, through the official's own individual actions, had violated the Constitution. **[15]** The students' First Amendment and equal protection claims against the facilities services director straightforwardly tied him to violations of both constitutional provisions. The students alleged that, relying on a standardless and unwritten policy, the director denied the students permission to place their newspaper bins in locations where the official paper was permitted to place its bins. **[16]** The students' complaint stated valid § 1983 claims for First Amendment and equal protection

violations because it pleaded that he personally applied the policy against the students after the confiscation.

**[17]** As to the students' claims against the university's president and vice president, the question was whether allegations of supervisory knowledge and acquiescence suffice to state claims for speech-based First Amendment and equal protection violations. **[18]** Constitutional tort claims against supervisory defendants turn on the requirements of the particular claim—and, more specifically, on the state of mind required by the particular claim—not on a generally applicable concept of supervisory liability.

**[19]** The court of appeals concluded that knowledge suffices for free speech violations under the First and Fourteenth Amendments. The government may violate the Free Speech Clause even if it acts without the purpose of curtailing speech. Free speech claims do not require specific intent. **[20]** In addition, the rationales that have led the Supreme Court to read specific intent requirements into certain other constitutional tort claims do not apply in the free speech context. The court of appeals concluded that allegations of facts that demonstrate an immediate supervisor knew about the subordinate violating another's federal constitutional right to free speech, and acquiescence in that violation, suffice to state free speech violations under the First and Fourteenth Amendments. The students' complaint stated First Amendment and Equal Protection claims against the university's president and vice president.

**[21]** When a supervisory official advances or manages a policy that instructs its adherents to violate constitutional rights, then the official specifically intends for such violations to occur. Claims against such supervisory officials, therefore, do not fail on the state of mind requirement. **[22]** The students' complaint created a plausible inference that the facilities director was responsible for the continued operation of the newspaper bin policy, describing his job responsibilities

as overseeing campus administration related to facilities. **[23]** Because the complaint alleged that the facilities director was in charge of the newspaper-bin policy and that the confiscation without notice was conducted pursuant to that policy, the complaint pleaded a due process claim against the facilities director.

**[24]** The students' complaint did not tie the university president or vice president to the confiscation, through the policy or any other means. The complaint did not state due process claims against them. **[25]** The complaint also failed to sufficiently state claims against the university's vice provost. **[26]** The court of appeals also ruled that the district court abused its discretion in denying the students leave to amend their complaint, because they might be able to remedy the deficiencies in the claims. The judgment of the district court had to be reversed and the case had to be remanded.

Judge Ikuta dissented in part, writing that, under *Iqbal*, an official is not liable under § 1983 for simply knowing about a lower ranking employee's misconduct and failing to act—in holding otherwise, the majority resurrected the very kind of supervisory liability that *Iqbal* interred.

## COUNSEL

Heather Gebelin Hacker, Alliance Defense Fund, Folsom, California, for the plaintiffs-appellants.

Karla H. Ferrall, Assistant Attorney General, State of Oregon, Salem, Oregon, for the defendants-appellees.

Steven W. Fitschen, Virginia Beach, Virginia, for *amicus curiae* The National Legal Foundation.

James J. Manning, Jr., Reid & Hellyer, Riverside, California, and Frank D. LoMonte, Arlington, Virginia, for *amicus curiae* Student Press Law Center.

**OPINION**

TASHIMA, Circuit Judge:

The complaint alleges that employees in Oregon State University's Facilities Department gathered up the outdoor newsbins belonging to the *Liberty*, a conservative student monthly, and threw them in a heap by a dumpster in a storage yard. The employees acted pursuant to an unwritten and previously unenforced policy governing newsbins on campus. They did not notify anyone at the *Liberty* before confiscating the newsbins. After the confiscation, University officials denied the paper permission to replace the bins anywhere but in two designated campus areas — limited areas to which the University's traditional student paper, the *Daily Barometer*, was not confined.

Plaintiffs, the *Liberty*'s student editors and student publishers, sue under 42 U.S.C. § 1983. We have little trouble finding constitutional violations. The real issue is whether the complaint properly ties the violations to the four individual defendants, who are senior University officials. Plaintiffs confront a familiar problem: they do not know the identities of the employees who threw the newsbins into the trash heap, and they do not know which University official devised the unwritten policy or which official gave the order to confiscate the bins. Plaintiffs do know, however, that three of the four defendants participated in the decision to deny them permission to place bins outside of the designated areas after the confiscation. We conclude that the complaint states claims against those three defendants based on this post-confiscation decision. We also hold that the complaint states a claim against one defendant — the Director of Facilities Services — based on the confiscation itself.

**I**

We accept as true the well-pleaded facts in the complaint. *Starr v. Baca*, 652 F.3d 1202, 1220 (9th Cir. 2011). Plaintiff-

appellant OSU Students Alliance is a registered student organization at Oregon State University ("OSU" or the "University"). Its members are all OSU students. OSU Students Alliance publishes the *Liberty*, an independent student newspaper distributed to students on OSU's campus in Corvallis, Oregon. The *Liberty* is a conservative student newspaper that styles itself as an alternative to the University's official student paper, the *Daily Barometer*. The *Liberty* is funded through private donations and advertising revenue. OSU Students Alliance may apply for and receive student fees to fund the *Liberty*, but has chosen not to apply for those funds to maintain its independence. The *Daily Barometer* is funded through student fees and advertising revenue.

In 2002, OSU Students Alliance began distributing the *Liberty* on campus via newsbins. The OSU Facilities Services gave OSU Students Alliance permission to place these bins around campus, including in dining halls and the Memorial Union.

In 2005, OSU Students Alliance placed eight new bins around campus. OSU Students Alliance placed the bins in the areas of campus with the heaviest student traffic — near the bookstore, dorms, football stadium, and other locations. Most of these locations already had the *Barometer* bins, and OSU Students Alliance's goal was to place bins next to the *Barometer* so that students would pick up a copy of both student newspapers. After one bin was stolen, OSU Students Alliance used wire bicycle chains to secure the remaining seven bins to nearby light or sign poles. In total, the *Liberty* had seven outdoor distribution bins.

At the time of the complaint, the *Barometer* had 24 distribution bins, which were located throughout campus. Off-campus newspapers, including the *Corvallis Gazette-Times*, *Eugene Weekly*, and *USA Today* also had distribution bins on campus. Each of these newspapers had bins chained to fixtures such as light posts or building columns.

During the 2008-09 winter term, all seven of the *Liberty's* outdoor distribution bins disappeared from campus.[1] The bins of the other papers, including the other off-campus papers, were left untouched. Because OSU had given the *Liberty* permission to place its bins at specific locations throughout campus, and had not revoked that permission, the *Liberty*'s editors had no reason to suspect their bins had been confiscated by the University. Thus, they called the police. Only through the police investigation did they learn of the University's involvement. After contacting the Facilities Department, the student editors recovered the seven newsbins from the storage yard, where they had been left "heaped on the ground." One bin was cracked and others had spilled open, resulting in the loss of 150 copies of the *Liberty* to water damage. The wire bicycle locks that the editors used to secure the bins against theft had been cut.

The Facilities Department's customer service manager told plaintiff William Rogers, the *Liberty*'s executive editor, that the Department had removed the bins because it was "catching up" on its enforcement of a 2006 University policy that prohibited newsbins in all but two designated campus locations, one near the bookstore and another by the student union. The customer service manager told Rogers that, going forward, the *Liberty* could not place newsbins anywhere but in the designated areas.

Rogers complained by email to defendant Ed Ray, President of OSU, who responded that the events surrounding the *Liberty* were "news to him." Ray copied defendant Mark McCambridge, Vice President of Finance and Administration, and defendant Larry Roper, Vice Provost for Student Affairs, on the email and indicated that these individuals would contact Rogers about the incident. Several days later, defendant Vincent Martorello, the Director of Facilities Services, called

[1] The Liberty also had a few indoor distribution bins, but the record does not state whether the indoor bins were removed as well.

Rogers and explained, much like the customer service manager had, that the University's newsbin policy prohibited the *Liberty* from placing bins anywhere but in the two designated locations. Martorello said the purpose of the 2006 policy was to keep the campus clean by regulating newsbins belonging to "off-campus" publications. Martorello also said that the policy did not allow bins to be chained to school property

Martorello's explanation perplexed Rogers. He did not consider the *Liberty* an "off-campus" paper, because it was written and edited entirely by OSU students and published by the OSU Student Alliance, a Registered Student Organization ("RSO").[2] Also, OSU had not applied the policy against the *Daily Barometer*, the traditional school paper, nor against the other off-campus newspapers such as the *Corvallis Gazette-Times*, *Eugene Weekly*, and *USA Today*, which continued to place their newsbins throughout the campus, not just in the designated areas. The only apparent difference between the two papers' connection to the OSU community was that the *Barometer* supplemented its advertising revenue by accepting student fees from the University, whereas the *Liberty* received private funding and advertising revenue but no student fees.[3]

Rogers challenged the application of the policy against the *Liberty*. He wrote Martorello a long email explaining that the *Liberty* was a student paper and requesting permission to place newsbins outside of the designated areas, just as the *Barometer* was allowed to do. Martorello initially agreed to assess the "potential of adding additional [*Liberty*] bins on campus. But two weeks later, Martorello tersely denied Rogers' request: "The Liberty is not in the same situation as the

---

[2]The OSU Student Alliance had allowed its RSO status to lapse due to an oversight sometime in 2007 or 2008, but it renewed its status in 2009. Neither side argues that the temporary lapse is relevant.

[3]Plaintiffs represent that the *Liberty* "may apply for and receive student fees . . . but has chosen not to apply for those fees to maintain its independence."

Barometer and will need to be located at the approved loca-tions . . . ."

In an earlier email to Rogers, Vice President McCambridge had explained the more onerous restrictions on the *Liberty*, as opposed to the *Barometer*, as follows: "As a newspaper that is not funded by ASOSU [the Associated Students of OSU], we don't have the same communications availability between your paper and the University . . . ." McCambridge also said that OSU would work with Rogers on finding newsbin loca-tions for the *Liberty*, but that those locations would "be agreed to within the parameters that the University deter-mines." McCambridge left ultimate resolution of the matter in Martorello's hands, writing that Martorello would keep both him and President Ray informed about the progress of the *Liberty*'s request for better campus access.

After Martorello definitively denied the request, the *Liber-ty*'s editors asked him for a copy of the policy governing newsbins. In response, they received an email from Charles Fletcher, Esq., Associate General Counsel of OSU, who explained that the 2006 policy was unwritten:

> There is no specific written policy that governs the placement of publication bins, and none is required. OSU's control over its grounds, buildings, and facili-ties . . . is plenary under ORS Chapters 351 and 352 . . . subject only to limited exceptions that do not apply here. I hope this helps.

Fletcher also suggested that the policy did not apply to the *Barometer* because it had been "the campus newspaper since 1896" and because it was funded by ASOSU. In another mes-sage, Fletcher explained:

> The mere fact that The Liberty has students on staff does not mean that it is entitled to the same bin loca-tions as the Daily Barometer. The Daily Barometer

was established over 100 years ago as the OSU student newspaper. It's published by the OSU Student Media Committee on behalf of ASOSU. The Liberty, on the other hand, is not published by OSU and receives almost all of its funding from outside sources.

Arguing that the unwritten policy arbitrarily distinguished between the *Liberty* and the *Barometer*, the *Liberty*'s editors drafted a proposed alternative policy under which both publications would receive equal campus access. The administration refused to consider the proposal. In a final email reaffirming the University's commitment to the policy, Fletcher wrote that he had "been in communication with President Ray and Vice President McCambridge" about plaintiffs' objections to the policy, but asserted that the policy was constitutional.

Plaintiffs filed an action under 42 U.S.C. § 1983 alleging violations of their constitutional rights to free speech, due process, and equal protection. They sought injunctive and declaratory relief and damages. Soon thereafter, OSU adopted a written policy on newspaper bins which, in contrast to its unwritten predecessor, does not distinguish between "on-campus" and "off-campus" publications. Rather, the written policy allows any person to obtain permission to place a newsbin on campus by submitting a request form and complying with certain physical requirements, such as that bins "shall be placed on a level surface and kept in an upright position."

In light of the new policy, the district court dismissed as moot the claims for injunctive and declaratory relief. As for the damages claims, it held them deficient because the complaint did not allege that any of the four defendants had participated in the confiscation of the newsbins. The district court did not consider the allegations about the aftermath of the confiscation, when the University continued to apply the unwritten policy against the *Liberty*. The court dismissed the

damages claims for failure to state a claim, and granted judgment for defendants without leave to amend. *See OSU Student Alliance v. Ray*, 692 F. Supp. 2d 1278 (D. Or. 2010). It also denied plaintiffs' post-judgment motion seeking leave to amend. Plaintiffs appeal only the dismissal of the damages claims and the denial of leave to amend.

## II

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo the dismissal of a complaint for failure to state a claim. *Starr*, 652 F.3d at 1205. To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must "allege 'sufficient factual matter . . . to state a claim to relief that is plausible on its face.' " *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)); *see also Starr*, 652 F.3d at 1216 ("[T]he factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."). In reviewing a dismissal under Rule 12(b)(6), we accept the well-pleaded factual allegations of the complaint as true and construe them in the light most favorable to plaintiffs. *Id.*; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## III

To state a claim under § 1983 against state officials in their individual capacities, a plaintiff must plead that the officials, "acting under color of state law, caused the deprivation of a federal right." *Suever v. Connell*, 579 F.3d 1047, 1060 (9th Cir. 2009) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). No one disputes that the four defendants acted under color of state law. Defendants argue that plaintiffs fail to plead the other two elements: (1) the deprivation of a federal right; and (2) causation. We begin our analysis with the first element.

The complaint asserts violations of three constitutional rights: free speech, equal protection, and procedural due process.

**A**

**[1]** The circulation of newspapers is expressive conduct protected by the First Amendment. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760 (1988); *Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002) ("[I]t is beyond dispute that the right to distribute newspapers is protected under the First Amendment . . . .") (citation omitted). Therefore, if the government wishes to regulate the placement of newsbins in a public forum, it must do so according to established, content-neutral standards. *See Plain Dealer*, 486 U.S. at 760. A city ordinance violates the First Amendment if it allows the mayor to grant or deny applications for newsbin permits without creating standards to limit the mayor's discretion — beyond requiring that he "state the reasons" for a denial — because the absence of established decision-making criteria makes it "far too easy" for the mayor to practice censorship by offering "*post hoc* rationalizations" and "shifting or illegitimate" justifications. *Id.* at 758; *see id.* at 763 ("[The] danger [of content and viewpoint censorship] is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official."); *see also G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006) ("To avoid impermissible discretion, the challenged ordinance should 'contain adequate standards to guide the official's decision and render it subject to effective judicial review.' ") (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002)). On the other hand, a city ordinance that seeks to reduce sidewalk clutter by establishing a content-neutral lottery to award a limited number of newsbin permits does not violate the First Amendment, because the lottery establishes a clear basis for distinguishing between permit applicants. *See Honolulu Weekly*, 298 F.3d at 1044.

**1**

**[2]** To decide whether the complaint adequately pleads a First Amendment violation under these principles, we must first determine the nature of the relevant forum — namely, the OSU campus. *Ariz. Life Coal. Inc. v. Stanton*, 515 F.3d 956, 968 (9th Cir. 2008) ("The first step in assessing a First Amendment claim relating to private speech on government property is to identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic.") (internal quotation marks omitted). "Forum analysis has traditionally divided government property into three categories: public fora, designated public fora, and nonpublic fora." *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007) (internal quotation marks omitted). The traditional public forum is a place "which by long tradition . . . ha[s] been devoted to assembly and debate." *Id*. (internal quotation marks omitted). The designated public forum "exists when the government intentionally dedicates its property to expressive conduct." *Id*. (internal quotation marks omitted). The non-public forum is "any public property that is not by tradition or designation a forum for public communication." *Id*. (internal quotation marks omitted).

There is also a fourth category, the limited public forum, which is a partially designated public forum:

> The government is not left with only the two options of maintaining a non-public forum or creating a designated public forum; if the government chooses to open a non-public forum, the First Amendment allows the government to open the non-public forum for limited purposes. The limited public forum is a sub-category of a designated public forum that refers to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics.

*Id.* at 830-31 (internal quotation marks omitted).

In traditional and designated public fora, content-based restrictions on speech draw strict scrutiny. *Id.* at 830. But in a limited public forum, speech restrictions are constitutional so long as they: (1) comport with the definition of the forum (for example, the government cannot exclude election speech from a forum that it has opened specifically for election speech); (2) are reasonable in light of the purpose of the forum; and (3) do not discriminate by viewpoint. *Id.* at 831.

**[3]** OSU's campus is at least a designated public forum. Section 576-005-0015(1) of the Oregon Administrative Rules, which governs public areas at OSU, states that "University grounds are open to the public and the University community for speech activities except any grounds designated for authorized access only." Through this rule, the state has "intentionally dedicate[d] [campus] property to expressive conduct," thereby creating a designated public forum. *Flint*, 488 F.3d at 830 (internal quotation marks omitted); *see Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 116-17 (5th Cir. 1992) (holding that public university campus was a designated public forum because a university rule opened the campus to speech activities).**⁴**

**[4]** Defendants argue that OSU's adoption of the unwritten newsbin policy converted the campus from a designated pub-

---

**⁴**Because traditional and designated public fora are subject to the same constitutional restrictions, we need not decide whether the campus is a traditional public forum. *See Flint*, 488 F.3d at 830. In the past, we have suggested that college campuses may be traditional public fora for students, *id.* at 831, but we have also noted that a university retains "the power to foster an atmosphere and conditions in which its educational mission can be carried out . . . ." *Souders v. Lucero*, 196 F.3d 1040, 1045 (9th Cir. 1999); *see also Desyllas v. Bernstine*, 351 F.3d 934 (9th Cir. 2003) (holding that a university could limit fliers to designated bulletin boards because the bulletin boards were designated public fora while other hallway walls were nonpublic fora).

lic forum into a limited public forum that excluded noncompliant newsbins from the scope of permissible speech activities. This reasoning is circular: the contention is that the policy placed a limitation on the forum, and that the limitation on the forum in turn justified the policy. If speech restrictions in a designated public forum automatically constituted limitations on the scope of the forum itself, then the concept of the "designated public forum" would merge entirely with that of the limited public forum: in either type of forum, the government would be able to exclude speech subject only to the limitations of reasonableness and viewpoint neutrality. To destroy the designation of a public forum, the government must do more. It must consistently apply a policy specifically designed to maintain a forum as non-public. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1075-76 (9th Cir. 2001). "[A] general policy of open access does not vanish when the government adopts a specific restriction on speech, because the government's policy is indicated by its *consistent* practice, not each exceptional regulation that departs from the consistent practice." *Hays Cnty. Guardian*, 969 F.2d at 117-18. Accepting as true the allegations in the complaint, OSU's newsbin policy was unwritten and, prior to its application against the *Liberty*, entirely unenforced. Therefore, the policy did not establish a consistent practice aimed at partially closing the campus to speech activities and, accordingly, did not vitiate the codified designation of OSU's campus as a public forum.

**2**

**[5]** Having concluded that the OSU campus is a public forum, we now consider whether enforcement of the unwritten policy against the *Liberty* violated the rule of *Plain Dealer*: restrictions on newspaper circulation in public fora are unconstitutional unless enforced according to established, content-neutral standards. Plaintiffs expressly decline to argue that the unwritten nature of OSU's policy alone demonstrates an unconstitutional lack of standards. They cite no law on this issue, but their concession is probably correct. If OSU had

announced and consistently applied a straightforward but unwritten rule about newsbins — for example, that newsbins could not be chained to lampposts — the University's failure to codify the rule might not be fatal. *See Thomas*, 534 U.S. at 322-32 (approving of licensing standards that are "limited by [their] terms, *or by nondiscriminatory practice*, to [content-neutral] considerations . . . .") (emphasis added) (internal quotation marks omitted).

**[6]** The policy that OSU enforced against plaintiffs, however, was not merely unwritten. It was also unannounced and had no history of enforcement. It materialized like a bolt out of the blue to smite the *Liberty*'s, but not the *Daily Barometer*'s, newsbins onto the trash heap. The policy created no standards to cabin discretion through content or history of enforcement, and it set no fixed standard for a distinction between the *Barometer* and the *Liberty*. The policy's enforcement against plaintiffs therefore violated the First Amendment. *See Plain Dealer*, 486 U.S. at 769.

Of course, after the initial confiscation, while plaintiffs sought permission to replace their newsbins throughout campus, defendants did try to explain the line they drew between the two student newspapers. Fletcher, the Associate General Counsel, emphasized the *Barometer*'s status as OSU's traditional, flagship paper: "The Daily Barometer was established over 100 years ago as the OSU student newspaper. It's published by the OSU Student Media Committee . . . ." Martorello and McCambridge invoked the concept of "off-campus" versus "on-campus" publications and reasoned that the *Liberty* was off-campus because it received outside funding, which, in turn, somehow impeded communication with the University.

These explanations have clear constitutional flaws. Fletcher's explanation raises the ominous specter of viewpoint discrimination. *See Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001) ("'[V]iewpoint discrimination' occurs when the

government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject.") (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 59 (1983)); *see also Hays Cnty. Guardian*, 969 F.2d at 121 (holding that a university could not favor its official student paper over competing papers). And both explanations invoke criteria — established versus unestablished publications; on-campus versus off-campus funding — that bear no relationship to the University's purported interests in reducing clutter and maintaining the aesthetic beauty of campus. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424-25 (1993) (holding that a city ban of only commercial newsracks was not narrowly tailored, and was therefore unconstitutional, because "the distinction [between commercial and noncommercial racks] [bore] no relationship *whatsoever* to the particular interests [in aesthetics] that the city [ ] asserted").

The explanations' most obvious flaw, however, and the flaw that guides our decision here, is their timing. Because defendants offered the explanations only after the confiscation, in an effort to justify the University's application of an unannounced and unenforced policy, the explanations cannot be distinguished from *post hoc* rationalizations. *See Plain Dealer*, 486 U.S. at 760. Maybe the unwritten policy sought from its inception to differentiate papers based on their sources of funding, or maybe OSU officials seized upon this criterion after the *Liberty* published something that infuriated them. The "policy's" lack of established standards muddles the provenance of defendants' explanations in a manner that is unconstitutional under *Plain Dealer*. The fact that the "policy" was not written or otherwise established by practice meant there were no standards by which the officials could be limited. It left them with unbridled discretion.[5]

---

[5]By "standard" we mean a set of requirements for use as a rule or basis of comparison established in advance to judge the acceptability of a particular object.

In recent years, courts have limited the rule against just such unbridled discretion. In *Thomas*, which concerned a permitting ordinance for events in a public park, the Supreme Court rejected the contention that the ordinance's thirteen enumerated grounds for denial of a permit were "insufficiently precise because they [we]re described as grounds on which the Park District 'may' deny a permit, rather than grounds on which it must do so." 534 U.S. at 324.[6] Similarly, we have determined that a permitting scheme is not unconstitutional simply because it contains "somewhat elastic" provisions that allow "reasonable discretion to be exercised by the permitting authority." *Desert Outdoor Adver. v. Oakland*, 506 F.3d 798, 807 (9th Cir. 2007) (internal quotation marks omitted). So long as the ordinance contains standards that are "significantly . . . concrete," it does not confer unconstitutionally broad discretion. *Id.*

Those holdings, however, do not aid defendants. Although courts have qualified *Plain Dealer* and earlier unbridled discretion cases by finding that a certain degree of flexibility in a permitting scheme does not make it unconstitutional, no court has held that a standardless policy passes muster. OSU's unwritten policy provided that newsbins of all newspapers were limited to two locations, except for the *Barometer's* newsbins, which could be placed anywhere on campus. But even that policy was not enforced evenly. Only the newsbins of the *Liberty* were removed, not the newsbins of other papers the University did not control, such as the *Corvallis Gazette-Times*, *Eugene Weekly*, and *USA Today*. Thus, we conclude that this "standard" that the University voiced after the *Liberty* filed suit was really no standard at all. Its application to the *Liberty's* newbins therefore violated the First Amendment.

---

[6]"Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." *Thomas*, 534 U.S. at 325.

*See Thomas*, 534 U.S. at 323 ("[A] time, place, and manner regulation [must] contain adequate standards to guide the official's decision and render it subject to effective judicial review.").[7]

[7] Defendants do not cite *Plain Dealer* or make any argument about the policy's lack of standards. Instead, they defend the policy as a valid time, place, manner restriction. But a speech restriction cannot satisfy the time, place, manner test if the restriction does not contain clear standards. To identify just one problem, the time, place, and manner test requires content neutrality. *Klein v. City of San Clemente*, 584 F.3d 1196, 1200-01 (9th Cir. 2009) (quoting *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) (time, place, and manner restrictions "must be content-neutral, be narrowly tailored to serve an important government interest, and leave open ample alternative channels for the communication of the message")). One cannot tell if OSU's unwritten policy was content-neutral, because the policy did not disclose the basis

---

[7]In *Hays County Guardian*, the Fifth Circuit struck down a university regulation that prohibited the handing out of newspapers on campus unless the papers contained no advertising or were sponsored by a student organization. 969 F.2d at 120-21. However, *Hays* also rejected an "unbridled discretion" challenge to a different university regulation that limited newsbins to areas "designated in advance by the Dean of Students." *Id.* at 121-22. Although the regulation included no criteria to guide the Dean's decisions, the court found that *Plain Dealer*'s holding on unbridled discretion did not apply because the regulation gave the Dean discretion to distinguish only between locations, not between the publications that sought to use those locations. *Id.* at 122. Yet, the *Hays* opinion makes clear that the university allowed its official student paper to place newsbins throughout campus, not just in the "designated areas" to which other papers were confined. *Id.* at 115. Perhaps the terms of the regulation contemplated distinctions only between locations, but the administrators nonetheless distinguished between publications by determining which publications fell under the policy and which did not. The *Hays* court's attempt to distinguish *Plain Dealer* is thus unpersuasive. In any event, in this case, there is no dispute that OSU applied its newsbin policy to distinguish between publications, not merely locations. Accordingly, even under the Fifth Circuit's reasoning, *Plain Dealer* applies.

on which it distinguished between publications. As *Plain Dealer* explains:

> [T]he absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech.

486 U.S. at 758. OSU's standardless policy cannot qualify as a valid time, place, and manner restriction. *Id*; *see also Thomas*, 534 U.S. at 323; *Kaahumanu v. Hawaii*, 682 F.3d 780, 805-07 (9th Cir. 2012).

**[8]** Plaintiffs also correctly pleaded that the University applied its "policy" to discriminate against the *Liberty* because of its viewpoint. That the University did not apply its "policy" as articulated by attorney Fletcher equally across all the newspapers with bins on campus adequately alleges that the policy was really just an ad hoc attempt to rationalize viewpoint discrimination — and a poor one at that.[8] Once one applies reasonable construction principles to the complaint's allegations which incorporate Fletcher's explanation, and translates the Orwellian euphemism of better "communications" based on University funding, the words mean the University has control over the *Barometer* through its funding, control which it doesn't have over *Liberty* and that is the reason for the application of its news bin "policy" to limit *Liberty's* access to the student body. The complaint alleges that

---

[8]Similarly, when a *Batson* challenge is brought in a criminal case and we evaluate a prosecutor's race-neutral explanation for striking a potential juror, we analyze whether the prosecutor applied that same rationale across the entire venire of similarly-situated potential jurors, or just as a *post hoc* rationalization for striking that one juror. *See Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008).

OSU officials removed and restricted the newsbins because the officials disliked the *Liberty*'s viewpoints. In other words, leaving the policy's defects aside, plaintiffs assert that OSU violated the First Amendment by enforcing the policy in a viewpoint-discriminatory fashion. *See Thomas*, 534 U.S. at 325 (noting that even if an ordinance is facially valid, it violates the constitution if applied in a content- or viewpoint-discriminatory fashion); *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009). Under this theory, the complaint plausibly alleges that OSU officials applied the policy to quash the *Liberty's* viewpoint, rather than on the basis of some unarticulated, content- and viewpoint-neutral criterion. Hence, the allegations of the complaint sufficiently state a non-neutral viewpoint restriction to speech in a designated public forum.

[9] Thus, the complaint adequately pleads a First Amendment violation on two grounds by applying a standardless policy to draw a distinction between the *Liberty* and the *Barometer* and by engaging in viewpoint discrimination.

**B**

Plaintiffs press equal protection claims on the theory that the University treated them differently than similarly situated persons by restricting the *Liberty*'s newsbins but not the newsbins of other publications.

The equal protection claims rise and fall with the First Amendment claims. Plaintiffs do not allege membership in a protected class or contend that the University's conduct burdened any fundamental right other than their speech rights. Therefore, the University's differential treatment of plaintiffs will draw strict scrutiny (as opposed to rational basis review) under the Equal Protection Clause only if it impinged plaintiffs' First Amendment rights. *See ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 797-98 (9th Cir. 2006); *Monterey Cnty. Democratic Cent. Comm. v. U.S. Postal Serv.*, 812 F.2d

1194, 1200 (9th Cir. 1987) (noting, with regard to "equal protection claims relating to expressive conduct," that "[o]nly when rights of access associated with a public forum are improperly limited may we conclude that a fundamental right is impinged").

**[10]** As we have already explained, the complaint properly alleges that the University infringed plaintiffs' speech rights by employing a standardless policy to draw a distinction between the *Liberty* and the *Barometer* and by engaging in viewpoint discrimination. Therefore, the complaint also states equal protection claims for differential treatment that trenched upon a fundamental right. *See ACLU of Nev.*, 466 F.3d at 798.

Defendants argue that the equal protection claims' dependence on the First Amendment claims requires dismissal of the equal protection claims. There is no authority for this proposition. At least twice, the Supreme Court has analyzed speech-based equal protection claims that were coupled with First Amendment claims without suggesting that the claims' common analytical predicate foreclosed one claim or the other. *See Perry*, 460 U.S. at 54; *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 94-95 (1972); *see also Hill v. Colorado*, 530 U.S. 703, 709 (2000). Although the Court has noted that one analysis will often control both claims, *see Perry*, 460 U.S. at 54, it has never invoked the concept of duplicity or redundance to find preclusion of a speech-based equal protection claim. Defendants rely on a footnote in a Ninth Circuit decision which, after noting that the plaintiff had "made only passing reference to [his speech-based] Equal Protection [theory] in his Complaint and dedicated to it only one sentence in his opening brief on appeal," quoted a treatise for the proposition that "[i]t is generally unnecessary to analyze laws which burden the exercise of First Amendment rights . . . under the equal protection guarantee." *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001). This footnote recognizes that the two types of claims share a common analytical foundation, but it stops well short of barring a plaintiff from bringing a

§ 1983 claim for violation of a constitutional right simply because that violation mirrors the violation of a different right.

**[11]** The complaint adequately pleads an equal protection violation.

## C

Plaintiffs contend that the University violated their due process rights by confiscating the newsbins without notice.

**[12]** Due process generally requires that the government give notice before seizing property. *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008) ("[T]he government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking."). This general rule has exceptions. "The government need not give notice in an emergency, nor if notice would defeat the entire point of the seizure, nor when the interest at stake is small relative to the burden that giving notice would impose." *Id.* at 1093-94. Defendants invoke the final exception.

The *Clement* plaintiff had parked her car in the lot of the hotel where she resided, in violation of the car's "non-operational" registration, which barred the vehicle from accessible parking lots. *Id.* at 1092. Rather than issue her a ticket or notify her of the violation, the defendant police officer had the car towed. *Id.* The court found a due process violation because giving notice would not have imposed a burden on the officer. The car was parked in the lot with the hotel's permission, not in "the path of traffic," and the officer easily could have provided notice by leaving a ticket or informing the hotel clerk that plaintiff had to move the car. *Id.* at 1094-95. The court also noted that even though the vehicle was non-operational, the plaintiff had an appreciable interest in receiving notice before the tow. *Id.* at 1094 ("[T]he [typical

car] owner suffers some anxiety when he discovers that [his] vehicle has mysteriously disappeared from its parking spot . . . . [Also,] the owner will normally have to travel to the towing garage . . . which may involve significant cost . . . .").

**[13]** The complaint adequately pleads a due process violation under *Clement*. If the allegations are true, then OSU confiscated property without notice even though providing notice would have imposed, at most, only a minimal burden on OSU. After adopting the unwritten newsbin policy in 2006, the University waited more than two years to enforce it against the *Liberty*. Clearly there was no urgency and no reason to junk the bins instead of directing plaintiffs to remove them. Moreover, contact information for the paper's editorial board appeared inside the first page of every copy of the *Liberty*. Providing notice would have been as simple as flipping a page and making a phone call or sending an email. The Facilities Department's decision to forego this procedure in favor of summarily confiscating the newsbins — more like a "thief in the night" than a "conscientious public servant" — violated due process. *Id.* at 1093, 1095.

Defendants seek to distinguish *Clement* on the ground that plaintiffs here had only a small interest in receiving notice before the confiscation. Whereas the car owner in *Clement* was presumed to have suffered inconvenience, cost, and anxiety in locating and recovering her car after the tow, the argument goes, plaintiffs recovered their newsbins "with little effort or cost." Problematically, this argument ignores the "burden" prong of the *Clement* analysis: even if it were true that plaintiffs' interest in avoiding confiscation of the newsbins was small in some absolute sense, that interest certainly was not small "relative to the burden that giving notice would [have] impose[d]," because giving notice would not have imposed any burden at all. *Id.* at 1093-94. Moreover, the argument that plaintiffs weathered the confiscation with "little effort or cost" contravenes the factual allegations. Like the plaintiff in *Clement*, plaintiffs had no idea what had happened

to their newsbins after the confiscation; they had to call the police just to learn of OSU's involvement. And once plaintiffs located the bins in a heap by the dumpster, they had to clean them of mud and debris and then load and transport them out of the storage yard "over several trips." They lost 150 copies of the paper due to water damage. They had to arrange for the Facilities Department to repair one damaged bin. Because the Facilities Department took all seven of the *Liberty*'s outdoor newsbins, the confiscation likely hobbled the paper's circulation for a period. Plaintiffs had as much interest in avoiding this ordeal as the *Clement* plaintiff had in avoiding the tow of her non-operational vehicle, which she could not use for transportation in any event. *See id.* at 1094.

The complaint adequately pleads a due process violation.

## IV

More difficult is the question of individual causation — whether the complaint ties the constitutional violations to the individual defendants.

[14] Section 1983 suits, like *Bivens* suits, do not support vicarious liability.[9] "[E]ach government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 129 S. Ct. at 1949. The Attorney General's senior position does not by itself make him liable for racial and religious discrimination perpetrated by subordinates; rather, he must have engaged in culpable action or inaction himself. *Id.* at 1948. To state a valid § 1983 claim, "a plaintiff

---

[9]"[A] *Bivens* action is the federal analog to an action against state or local officials under § 1983." *Starr*, 652 F.3d at 1202. It is an action brought against federal employees for violations of a plaintiff's federal constitutional rights. *Minneci v. Pollard*, ___U.S.___, 132 S. Ct. 617, 602 (2012); *see generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971) ( "[V]iolation of [the Fourth Amendment] by a federal agent . . . gives rise to a cause of action for damages" against a Federal Government employee.").

must plead that each government-official defendant, through the official's own individual actions, had violated the Constitution." *Id.*

### A. First Amendment and Equal Protection Claims Against Martorello

[15] Some of plaintiffs' claims raise thorny questions under *Iqbal*, but the First Amendment and equal protection claims against Martorello, the Director of Facilities Services, are more straightforward. The complaint straightforwardly ties Martorello to violations of both constitutional provisions. After unknown Facilities Department employees threw the newsbins into the trash heap, the *Liberty*'s editors pleaded with Martorello for permission to replace the bins in locations beyond the "designated areas." The *Liberty* is an on-campus paper just like the *Barometer*, they said, and should enjoy the same access to campus. Martorello rejected these pleas directly. He told the editors that "[t]he Liberty is not in the same situation as the Barometer and [its bins] will need to be located at the approved locations by the Memorial Union." In other words, relying on a standardless and unwritten policy, Martorello denied plaintiffs permission to place their newsbins in locations where the *Barometer* was permitted to place its bins. He did so directly, not through subordinates, and therefore violated the First Amendment under *Plain Dealer* through his "own individual actions." *Iqbal*, 129 S. Ct. 1948. For the same reasons, he violated equal protection by discriminating against the *Liberty* in a way that impinged plaintiffs' speech rights. *See ACLU of Nev.*, 466 F.3d at 797-98.

As we shall see, *Iqbal* emphasizes that a constitutional tort plaintiff must allege that every government defendant — supervisor or subordinate — acted with the state of mind required by the underlying constitutional provision. 129 S. Ct. at 1948-49. Invidious discrimination claims require specific intent; accordingly, to state invidious discrimination claims against the Attorney General, Javaid Iqbal had to allege that

the Attorney General acted with the purpose of discriminating by race, religion, or national origin. *Id*. The First and Fourteenth Amendment free speech claims against Martorello, however, do not implicate this requirement, because the allegations show specific intent. After deliberating over plaintiffs' request, Martorello purposefully denied them the same campus access that the *Barometer* enjoyed. Even if free speech claims require specific intent (which they do not, as we conclude below), the complaint states claims against Martorello.

[16] The district court erred by considering only Martorello's involvement *vel non* in the confiscation of the bins, without considering his personal participation in continuing to enforce the unconstitutional policy against the *Liberty* after the confiscation. The court dismissed the claims against Martorello (and the other defendants) because it found that "plaintiffs do not allege that any individual defendants were involved in the bin removal process." This analysis is incomplete. Whether or not the complaint plausibly alleges that Martorello had a hand in the confiscation, it states valid § 1983 claims for First Amendment and equal protection violations because it pleads that he personally applied the policy against plaintiffs after the confiscation.

## B. First Amendment and Equal Protection Claims Against Ray and McCambridge

[17] The claims against President Ray and Vice President McCambridge require closer examination. According to the complaint, neither defendant actually made the decision to deny plaintiffs permission to place their newsbins throughout campus; Martorello did that. Both Ray and McCambridge, however, oversaw Martorello's decision-making process and knowingly acquiesced in his ultimate decision. Multiple emails excerpted in the complaint (one by McCambridge himself)[10] state that Martorello and Fletcher kept the President

---

[10]McCambridge's email to Rogers, the *Liberty*'s executive editor, indicates that McCambridge agreed with Martorello's eventual decision to

and Vice President informed about the status of the *Liberty* controversy — both before and after Martorello definitively decided that the unwritten policy required that the *Liberty* newsbins remain confined to the designated areas. According to the complaint, then, Ray and McCambridge knew that their subordinate, Martorello, was applying the previously unannounced and unenforced policy against the *Liberty*, but not against any of the other off-campus newspaper, and they did nothing to stop him. The question is whether allegations of supervisory knowledge and acquiescence suffice to state claims for speech-based First Amendment and equal protection violations.

**[18]** *Iqbal* does not answer this question. That case holds that a plaintiff does not state invidious racial discrimination claims against supervisory defendants by pleading that the supervisors knowingly acquiesced in discrimination perpetrated by subordinates, but this holding was based on the elements of invidious discrimination in particular, not on some blanket requirement that applies equally to all constitutional tort claims. *Iqbal* makes crystal clear that constitutional tort claims against supervisory defendants turn on the require-

_____

deny plaintiffs the same campus access given the *Barometer*. The McCambridge email, however, did not actually impose that decision. Rather, the email left the ultimate decision to Martorello, whom it indicated would "follow up" on plaintiffs' request and would "keep [Ray and McCambridge] informed." Unlike Martorello, then, McCambridge did not directly deny plaintiffs' request. The email does serve as evidence that McCambridge harbored an intent to deny plaintiffs expanded campus access when he ultimately acquiesced in Martorello's unconstitutional decision. And McCambridge's e-mail to Fletcher can be read to express the reason the University was intentionally limiting the *Liberty's* freedom of speech when he stated, "we don't have the same communications availability between your paper and the University", *i.e.*, the University did not have control over the content of the *Liberty*. However, because we conclude that knowledge and acquiescence suffices to state a First Amendment claim against a supervisor, we do not decide whether the complaint plausibly alleges that McCambridge acted with specific intent.

ments of the particular claim — and, more specifically, on the state of mind required by the particular claim — not on a generally applicable concept of supervisory liability. "The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." 129 S. Ct. at 1948. Allegations that the Attorney General (Ashcroft) and the director of the FBI (Mueller) knowingly acquiesced in their subordinates' discrimination did not suffice to state invidious racial discrimination claims against them, because such claims require specific intent — something that knowing acquiescence does not establish. *Id.* at 1949; *see Starr*, 652 F.3d at 1207 ("Holding [ ] Ashcroft and [ ] Mueller personally liable for unconstitutional discrimination if they did not themselves have a discriminatory purpose would be equivalent to finding them vicariously liable for their subordinates' violation . . . ."). On the other hand, because Eighth Amendment claims for cruel and unusual punishment generally require only deliberate indifference (not specific intent), a Sheriff is liable for prisoner abuse perpetrated by his subordinates if he knowingly turns a blind eye to the abuse. *See id.* at 1205. The Sheriff need not act with the purpose that the prisoner be abused. *See id.* at 1206-07 ("A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement — and the liability — of that supervisor."). Put simply, constitutional tort liability after *Iqbal* depends primarily on the requisite mental state for the violation alleged.

Section 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right;" therefore, the requisite mental state for individual liability will change with the constitutional provision at issue.[11] *Daniels v. Williams*, 474 U.S. 327, 330 (1986).

---

[11]Municipalities, in contrast, are subject to a generally applicable state of mind requirement that is independent of the underlying constitutional

Here, where President Ray and Vice President McCambridge are alleged to have knowingly acquiesced in their subordinate Martorello's violation of plaintiffs' free speech rights under the First and Fourteenth Amendments, we must decide whether knowledge (as opposed to purpose) satisfies the mental state requirement for free speech violations.[12]

---

provision. *See City of Canton v. Harris*, 489 U.S. 378, 389 n.8 (1989) ("[T]he proper standard for determining when a municipality will be liable under § 1983 for constitutional wrongs does not turn on any underlying culpability test that determines when such wrongs have occurred."); *see also* Sheldon Nahmod, *Constitutional Torts, Over-deterrence, and Supervisory Liability after Iqbal*, 14 Lewis & Clark L. Rev. 279, 305-06 (2010) (arguing that *Iqbal* and the *Canton v. Harris* doctrine of municipal liability are inconsistent).

[12]The idea that constitutional tort claims impose state of mind requirements comes from the tort concept of "duty." *See Monroe v. Pape*, 365 U.S. 167, 187 (1961) ("[Section 1983] should be read against the background of tort liability . . . ."). To state a § 1983 claim against a government defendant, the plaintiff must allege that the defendant acted with sufficient culpability to breach a duty imposed by the relevant provision of federal law. *See Starr*, 652 F.3d at 1207. The Equal Protection Clause, for example, imposes a duty not to purposefully discriminate on the basis of race, religion, or national origin. *Iqbal*, 129 S. Ct. at 1948-49. The Eighth Amendment imposes a duty not to act with deliberate indifference towards the imposition of cruel and unusual punishment. *Starr*, 652 F.3d at 1206-07. After *Iqbal*, the first question in a § 1983 case, like a common law tort case, is whether the defendant's conduct breached a duty to the plaintiff.

Also like common law torts, constitutional torts require proximate cause. Even if the defendant breached a duty to the injured party, the defendant is only liable if his conduct foreseeably caused the injury. *See Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009). Proximate cause is an objective requirement. It does not require a separate mental state; the element of duty requires a mental state. *See Bryan County v. Brown*, 520 U.S. 397, 404 (1997) (noting in the municipal liability context that "a plaintiff must show that the municipal action was taken with the requisite degree of culpability *and* must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (emphasis added). Of course, duty often eclipses proximate cause in the arena of intentional torts. An action taken with the purpose of violating a

If the inquiry sounds misplaced — if it strikes one as wrongheaded to speak of free speech violations and mental state requirements in the same breath — it is because the law has had scant occasion to address it. With some notable exceptions, courts before *Iqbal* generally did not have to determine the required mental state for constitutional violations, particularly not free speech violations. A uniform mental state requirement applied to supervisors: so long as they acted with deliberate indifference, they were liable, regardless of the specific constitutional right at issue. *See Preschooler II v. Clark Cnty. Sch. Bd. of Trs.* 479 F.3d 1175, 1182 (9th Cir. 2007) ("[A] supervisor is liable for the acts of his subordinates if the supervisor . . . knew of the violations of subordinates and failed to act to prevent them.") (internal quotations and alterations omitted); *see also* Kit Kinports, *Iqbal and Supervisory Immunity*, 114 Penn St. L. Rev. 1291, 1294-95 (2010) (noting that before *Iqbal*, the circuits had adopted generally-applicable mental state standards for § 1983 supervisory liability).[13] As for the subordinate officials who violate constitutional rights directly — the officer who shoots the suspect, the Facilities Department employee who junks the newsbins — they act intentionally in most cases. Perhaps they do not always know that their actions are unconstitutional

---

constitutional right, or the knowledge that such a violation will occur, will typically be the foreseeable cause of the ensuing violation, absent perhaps an intervening cause. *See, e.g., Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008). Still, confusing the two elements portends analytical mishap, particularly in the § 1983 context. Whereas proximate cause is a fixed requirement — it imposes the same hurdle upon on all § 1983 claims for individual liability regardless of the specific provision of federal law on which the claims are premised, *see Monroe*, 365 U.S. at 187 ("[§ 1983] makes a man responsible for the *natural consequences of his actions*") (emphasis added) — the duty requirement changes with the underlying claim.

[13]Not every circuit used the deliberate indifference standard for supervisory liability — at least one circuit found that gross negligence sufficed — but each circuit applied a *uniform* standard that did not depend on the particular constitutional right at issue. Kinports, *supra*, at 1295.

(hence, the qualified immunity defense), but they do intend to take the violative action. Thus, before *Iqbal*, fixing the mental state requirement for a particular constitutional provision was most often unnecessary. The line officers generally satisfied every mental state because they acted intentionally, and supervisors were subject to a uniform mental state requirement divorced from the underlying claim.[14] By abrogating the second half of this framework, however, *Iqbal* places new weight on the state of mind requirement for constitutional torts. Now claims against supervisors present problems that claims against subordinates typically do not: must the supervisor have harbored the specific intent to subject the plaintiff to the injury-causing act, or does knowledge or some lesser mental state suffice?[15]

---

[14]The constitutional tort claims that did require mental state analysis pre-*Iqbal* concerned injuries that resulted from inaction or inadvertence, *e.g.*, *Daniels v. Williams*, 474 U.S. 327 (1986) (procedural due process claim for injuries caused when deputy sheriff inadvertently left pillow on jail stairs); *Estelle v. Gamble*, 429 U.S. 97 (1976) (Eighth Amendment claim for failure to provide adequate medical care), and claims for invidious discrimination. *E.g.*, *Washington v. Davis*, 426 U.S. 229, 239 (1976).

[15]We understand *Iqbal*'s language eliminating the doctrine of "supervisory liability" to overrule circuit case law that, following *City of Canton v. Harris*, had applied a uniform test for supervisory liability across the spectrum of constitutional claims. *See* 129 S. Ct. at 1949 ("[The doctrine of] 'supervisory liability' is inconsistent with [the rule] the petitioners may not be held accountable for the misdeeds of their agents. In a § 1983 suit or a *Bivens* action . . . the term 'supervisory liability' is a misnomer."); *Kinports*, *supra*, at 1295 (summarizing circuit case law). *Iqbal* means that constitutional claims against supervisors must satisfy the elements of the underlying claim, including the mental state element, and not merely a threshold supervisory test that is divorced from the underlying claim. *Iqbal* does not stand for the absurd proposition that government officials are never liable under § 1983 and *Bivens* for actions that they take as supervisors. Nobody would argue, for example, that a supervisor who orders subordinates to violate constitutional rights escapes liability under *Iqbal*. As we held in *Starr*, even a supervisor's knowledge and acquiescence will suffice for liability in some circumstances. 652 F.3d at 1206-07; *see also Ammons v. Wash. Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1026, 1031 (9th Cir. 2011) (holding that involuntarily commit-

**[19]** For two reasons, we conclude that knowledge suffices for free speech violations under the First and Fourteenth Amendments.[16] First, it is black-letter law that government need not target speech in order to violate the Free Speech Clause. *United States v. O'Brien*, 391 U.S. 367 (1968), sets forth a framework for analyzing the constitutionality of laws that inhibit expressive conduct without aiming to do so:

> [A] government regulation [of expressive conduct] is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377.[17] The requirement that the governmental interest be "unrelated to the suppression of free expression" is but one prong in *O'Brien*'s four-pronged test. Even if a law has purely speech-neutral purposes — such as, for example, preservation of the orderly functioning of the draft system — its incidental effects on free expression still might violate the First Amend-

---

ted psychiatric patient stated due process claim against hospital administrator for failing to provide safe conditions through knowledge and acquiescence). *Iqbal* holds simply that a supervisor's liability, like any government official's liability, depends first on whether he or she breached the duty imposed by the relevant constitutional provision.

[16]Because the facts alleged do not require us to do so, we do not decide whether anything less than knowledge, such as recklessness or gross negligence, suffices.

[17]In *O'Brien*, the Supreme Court held that because of the government's substantial interest in assuring the continuing availability of draft cards, the statute making it a criminal offense to knowing destroy or mutilate a draft card was an appropriately narrow means of protecting the government's interest. The statute condemned only the independent noncommunicative impact of the conduct and was therefore not a violation of the defendant's right to freedom of speech.

ment if those effects are "greater than is essential" to further the speech-neutral interest. *Id.*; *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984) (applying intermediate scrutiny under the First Amendment to regulation prohibiting camping on national parks in Washington, D.C.). In other words, the government may violate the speech clause even if it acts without the purpose of curtailing speech. Free speech claims do not require specific intent.

Second, only in limited situations has the Supreme Court found constitutional torts to require specific intent. We know of three examples: (1) due process claims for injuries caused by a high-speed chase, *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998); (2) Eighth Amendment claims for injuries suffered during the response to a prison disturbance, *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986); and (3) invidious discrimination under the Equal Protection Clause and the First Amendment Free Exercise Clause. *Iqbal*, 129 S. Ct. at 1948. As for the first two examples, they turn on exigent circumstances not present in the free speech context. Because prison riots and high-speed chases do not afford officers time for "actual deliberation" before determining how best to carry out their official responsibilities, deliberate indifference does not suffice for liability in those contexts — the plaintiff must show intent. *Lewis*, 523 U.S. at 851, 852-53 ("As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical . . . ."). The reasoning does not apply to officials who embark on a course of conduct that curtails speech, because such officials — like Ray and McCambridge, for example — do not face similar exigencies. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 373 (9th Cir. 1998) ("[T]he critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct.").

As for invidious discrimination claims, the substance of the constitutional right to which the claims correspond — the

right not to be singled out *because of* some protected characteristic, like race or religion — calls for a specific intent requirement. *See Washington v. Davis*, 426 U.S. at 239 ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."). But the First Amendment Speech Clause is more absolute: a limitation on speech may be unconstitutional even if it follows from a law that, like many time, place, and manner restrictions, applies neutrally to expressive and non-expressive conduct alike. *See, e.g., Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1035 (9th Cir. 2009) (striking down as not narrowly tailored a parks regulation that required permits for activities "likely to require the provision of city services"). Thus, while a specific intent requirement inheres in claims for invidious discrimination, the same requirement does not inhere in claims for free speech violations.

**[20]**  For these two reasons — because Supreme Court case law indicates that free speech violations do not require specific intent, and because the rationales that have led the Court to read specific intent requirements into certain other constitutional tort claims do not apply in the free speech context — we conclude that allegations of facts that demonstrate an immediate supervisor knew about the subordinate violating another's federal constitutional right to free speech, and acquiescence in that violation, suffice to state free speech violations under the First and Fourteenth Amendments. The complaint alleges that Ray and McCambridge knowingly acquiesced in Martorello's decision to continue restricting the *Liberty*'s circulation under the standardless, unwritten newsbin policy. They stood superior to Martorello; they knew that Martorello denied plaintiffs' publication the same access to the campus that the *Barometer* received; and they did nothing. The complaint therefore states First Amendment and Equal Protection claims against Ray and McCambridge.[18]

---

[18]As we have already noted, *see* Part III.B, *supra*, the same analysis controls the First Amendment and speech-based equal protection claims.

## C.  Process Claims

Unlike the free speech violation, the procedural due process violation based on the University's failure to notify the owner of the newsbins prior to taking them did not endure beyond the confiscation of the newsbins. The Facilities Department threw the newsbins into the storage yard, without notice, but then allowed plaintiffs to reclaim the bins. Plaintiffs' task in tying Martorello and the other defendants to the due process violation is therefore more difficult than the free speech violation. To state a claim that defendants committed a procedural due process violation through their "own individual actions," plaintiffs must tie the defendants to the confiscation itself. *Iqbal*, 129 S. Ct. at 1949.

### 1.  Martorello

The allegations portray Martorello as the University official responsible for enforcing the unwritten newsbin policy. Thus, the question on which plaintiffs' due process claim against Martorello turns is not whether knowledge and acquiescence, deliberate indifference, or some lesser mental state meets the state of mind requirement for the claim, but rather whether an official's administration and oversight of an unconstitutional policy meets the required threshold. The Tenth Circuit confronted this question in *Dodds*, where the issue was whether the complaint stated a § 1983 claim against a Sheriff for a due process violation that occurred when jail officials denied the plaintiff the opportunity to post bail for several days after his arrest. 614 F.3d at 1189-90. The violation occurred pursuant

---

Unlike equal protection claims for racial or religious discrimination, speech-based equal protection claims do not require a showing that the plaintiff was singled out *because of* a particular characteristic. Rather, speech-based equal protection claims require only a showing that the plaintiff was subjected to differential treatment that trenched upon a fundamental right. *See ACLU of Nev.*, 466 F.3d at 797-98. Therefore, plaintiffs' equal protection claims do not require specific intent.

to a county policy that prevented detainees charged with felonies from posting bail before arraignment, even if bail had been pre-set in the arrest warrant. *Id.* at 1190. The Sheriff was in charge of the jail and therefore oversaw enforcement of the policy, although there was no allegation that he was involved in or aware of the policy's application against the plaintiff in particular. *Id.* at 1202-03. The court held that the complaint stated a claim:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

*Id.* at 1199 (quoting 42 U.S.C. § 1983). Because the Sheriff maintained the policy at the jail, and because the unconstitutional denial of the opportunity for the plaintiff to post bail followed directly from the policy, the Sheriff was held liable. *Id.* at 1203-04.

**[21]** We agree with *Dodds*. When a supervisory official advances or manages a policy that instructs its adherents to violate constitutional rights, then the official specifically intends for such violations to occur. Claims against such supervisory officials, therefore, do not fail on the state of mind requirement, be it intent, knowledge, or deliberate indifference. *Iqbal* itself supports this holding. There, the Court rejected the invidious discrimination claims against Ashcroft and Mueller because the complaint failed to show that those defendants advanced a policy of purposeful discrimination (as opposed to a policy geared simply toward detaining individu-

als with a "suspected link to the [terrorist] attacks"), not because it found that the complaint had to allege that the supervisors intended to discriminate against Iqbal in particular. 129 S. Ct. at 1952 (concluding that Javaid Iqbal failed to allege that the supervisory defendants created a policy that directed subordinates to discriminate by race or religion). Advancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability, no matter what the required mental state, so long as the policy proximately causes the harm — that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy.

Under these principles, the complaint states a due process claim against Martorello if it plausibly alleges that: (1) "he promulgate[d], implement[ed], or in some other way possesse[d] responsibility for the continued operation of" the newsbin policy; and (2) the due process violation (*i.e.*, the confiscation of the newsbins without notice) occurred pursuant to that policy.

**[22]** The complaint does not allege that Martorello devised the newsbin policy; plaintiffs have no way of knowing, without discovery, who at OSU devised the unwritten policy. But the complaint does create a plausible inference that Martorello was "responsib[le] for the continued operation of" the newsbin policy. *Dodds*, 614 F.3d at 1199. It describes his job responsibilities as "overseeing campus administration related to Facilities and creating, implementing, and/or administering university policies, including the policies and procedures challenged herein." Of course, the complaint also alleges that the other three defendants were responsible for the "policies and procedures" challenged in this action — *viz.*, the newsbin policy. But the allegation that Martorello bore responsibility for the operation of the policy is plausible — not conclusory — in light of other allegations in the complaint. Martorello was head of the Facilities Department. The unwritten newsbin policy governed use of OSU facilities and fell to the Facilities

Department for enforcement. The inference that Martorello oversaw enforcement of the policy flows naturally from these facts. Moreover, the allegations about the aftermath of the confiscation make plain that Martorello was the policy's steward. When plaintiffs complained about the unequal treatment the *Liberty* received vis-a-vis the *Barometer*, University officials tapped Martorello to handle the issue. It was Martorello who analyzed plaintiffs' petition for recognition as an "on-campus" publication under the policy, and it was Martorello who ultimately denied that petition. The complaint need not allege more plausibly to allege that Martorello bore responsibility for administration of the newsbin policy.

**[23]** As for proximate causation, the complaint pleads forthrightly that the unknown Facilities Department employees confiscated the newsbins pursuant to the policy that Martorello administered. According to the allegations, the Department's customer service manager told plaintiffs that the confiscation occurred because the Department "was finally 'catching up' with the policy." Similarly, when Martorello contacted plaintiffs after the confiscation, he "related the existence of the policy" and explained that "the University was trying to keep the campus clean and was therefore regulating 'off-campus' newspaper bins." Thus, because it alleges that Martorello was in charge of the newsbin policy and that the confiscation without notice was conducted pursuant to that policy, the complaint pleads a due process claim against Martorello.

We note two distinctions from the invidious discrimination claims that *Iqbal* rejected. First, Javaid Iqbal's complaint did not "contain facts plausibly showing that [Ashcroft and Mueller] purposefully adopted a policy of classifying post-September-11 detainees as 'of high interest' because of their race, religion, or national origin." 129 S. Ct. at 1952. Simply put, the complaint did not tie the alleged unconstitutional conduct — purposeful discrimination by race or religion — to any policy that the supervisory defendants advanced. This

case is different. Through concrete allegations, the complaint ties the unconstitutional confiscation of the newsbins to the policy that Martorello administered.

Second, the small scope of Martorello's operation matters. It is one thing to allege that, because some low-level government officers engaged in purposeful discrimination, a cabinet-level official must also have engaged in purposeful discrimination. But it is another thing to say that the director of a university facilities department had a hand in the unconstitutional manner in which his employees enforced a department-wide policy. The second claim is plausible. Like all claims at the pleading stage, of course, it requires development. For example, the complaint does not really clarify whether the policy (or Martorello's administration of the policy) directed employees to confiscate the newsbins *without notice*, or whether the employees improvised the failure to notify. To ask plaintiffs to clarify this point at the pleading stage, however, asks too much. They have not yet had discovery on what the unwritten policy required or on how Martorello told his employees to enforce it.

To be sure, when a plaintiff presses an implausible claim, lack of access to evidence does not save the complaint. *See Iqbal*, 129 S. Ct. at 1950 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). But where the claim is plausible — meaning something more than "a sheer possibility," but less than a probability — the plaintiff's failure to prove the case on the pleadings does not warrant dismissal. *Id.* at 1949 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (internal quotation marks omitted). Discovery will reveal whether Martorello's stewardship of the policy in fact called for confiscation without notice. All that matters at this stage is that the allegations nudge this inference "across the line from conceivable to plausible." *Id.* at 1951 (internal quotations omitted). Martorello was responsible for

the policy, Martorello's subordinates confiscated the bins without notice, and two people — including Martorello himself — said the subordinates had acted pursuant to the policy. That is enough to get discovery. *See Starr*, 652 F.3d at 1216 (holding that allegations must be sufficiently plausible "such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation"); *Pinnacle Armor*, 648 F.3d at 721 ("[A plaintiff] is not required to 'demonstrate' anything in order to survive a Rule 12(b)(6) motion to dismiss. Rather, it only needs to allege sufficient factual matter, accepted as true, to state a [plausible] claim to relief . . . .") (some internal quotation marks omitted).

## D. Due Process Claims Against Ray and McCambridge

**[24]** The complaint does not tie President Ray and Vice President McCambridge to the confiscation, through the policy or any other means. Unlike Martorello, these officials are not alleged to have run the department that enforced the policy or to have had any familiarity with the policy's requirements before the confiscation. (Recall Ray's "its news to me" response.) The averments thus do not support an inference that deliberate action or even recklessness by Ray or McCambridge caused the due process violation. Perhaps one could infer that the President and Vice President acted carelessly in presiding over subordinates who enforced an unconstitutionally standardless policy governing newspaper circulation, but even this inference would be inadequate, because negligence does not suffice for due process liability. *See Daniels*, 474 U.S. at 328 ("The Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."). Therefore, the complaint does not state due process claims against these defendants.

## E. Defendant Larry Roper

**[25]** The complaint names a fourth defendant, Larry Roper, against whom it makes only two factual averments. It

says that Roper was Vice Provost for Student Affairs, and that President Ray forwarded to Roper, along with two other persons, plaintiff Rogers' first email message complaining about the confiscation. That is the totality of the allegations against Roper. These allegations do not suffice to state any claims against Roper. One cannot infer that Roper knowingly acquiesced in the decision to continue applying the unconstitutional newsbin policy against plaintiffs after the confiscation, because nothing suggests that Roper knew about that decision. Rather, the complaint suggests that he was copied on one email and then fell out of the loop. The complaint does not even contain facts to suggest that the newsbin issue fell within Roper's purview or that he was derelict in not ensuring that the University handled the matter appropriately. The First Amendment and equal protection claims premised on the post-confiscation application of the policy therefore fail against Roper. As for the due process claim against him, it fails for the same reason that it fails against Ray and McCambridge: the allegations do not suggest that he had anything to do with the confiscation itself or the unconstitutional policy pursuant to which the confiscation occurred.

* * *

To summarize, we hold that the complaint states free speech claims under the First Amendment and the Fourteenth Amendment Equal Protection Clause against Martorello, Ray, and McCambridge; and that it states a due process claim against Martorello. We further hold that the complaint does not state due process claims against Ray and McCambridge, and that it does not state any claims against Roper.

## V

**[26]** The district court dismissed the complaint and entered judgment without granting plaintiffs an opportunity to amend. Plaintiffs did not request leave to amend until after the judgment issued, but the district court's with-prejudice dismissal

was still an abuse of discretion. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) ("[W]e have repeatedly held that 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not be cured by the allegation of other facts.' ") (quoting *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995)). Because plaintiffs might well be able to remedy the deficiencies in the claims against Roper and in the due process claims against Ray and McCambridge, we conclude that the district court abused its discretion in denying plaintiffs leave to amend their complaint. *See id.* at 1131. On remand, plaintiffs should be afforded that opportunity.

**REVERSED and REMANDED.**

---

IKUTA, Circuit Judge, dissenting in part:

Simply put, to state a claim under § 1983 against a government official, a plaintiff must allege that the official's "own misconduct" violated the plaintiff's constitutional rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). What the plaintiff must plead and prove "will vary with the constitutional provision at issue," based on the Supreme Court's decisions regarding what conduct violates that particular provision. *Id.* at 676. But the Supreme Court is quite clear that "supervisory liability" is a "misnomer" in § 1983 cases, and that officials "may not be held accountable for the misdeeds of their agents." *Id.* at 677.

The majority muddles and obscures this simple principle. Plaintiffs' complaint adequately alleges that Vincent Martorello, OSU's facilities services director, violated their First Amendment rights under § 1983 by personally and arbitrarily limiting *The Liberty*'s distribution on campus. But their complaint nowhere indicates how OSU's president, Ed Ray, and the vice president of finance and administration, Mark

McCambridge, also violated those rights through their "own individual actions." *Id.* at 676. The majority considers it sufficient that Ray and McCambridge "knowingly acquiesced" in Martorello's actions. Maj. op. at 12793. Under *Iqbal*, however, an official is not liable under § 1983 for simply knowing about a lower ranking employee's misconduct and failing to act. In holding otherwise, the majority resurrects the very kind of supervisory liability that *Iqbal* interred. I disagree with this departure from *Iqbal*.

*Iqbal* made it clear that a supervisor, like any other official, "is only liable for his or her own misconduct," *id.* at 677. Since the Supreme Court clarified this point, we have not held an official liable for inaction in the face of someone else's wrongdoing unless the official had a legal duty to act. Such a duty arises under only two narrow exceptions. The first exception applies when a statute expressly imposes the duty. *See Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011). In *Starr*, the prison sheriff was "required by statute to take charge of and keep the county jail and prisoners in it, and [was] answerable for the prisoner's safekeeping," and therefore was liable under § 1983 for supervisory omissions that would likely enable subordinates to commit a constitutional injury. *Id.* (quoting *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991). The second exception applies when the courts have recognized a legal duty arising "by virtue of a 'special relationship' between state officials and a particular member of the public." *Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991). *Ting* held that law enforcement officers may be held liable under § 1983 for inaction that breaches their "constitutional duty to protect those persons in [their] custody whom [they] know[ ] to be under a specific risk of harm from themselves or others in the state's custody or subject to its effective control." *Id.* (internal quotation marks omitted); *see also Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (school officials may be held liable for breaching a legal duty to report abuses committed by a subordinate or for failing to

take corrective action). In sum, for an official's inaction to deprive plaintiff of constitutional rights under color of law, the official must fail to act when the law requires action. *Cf. King v. Zamiara*, 680 F.3d 686, 706 (6th Cir. 2012) ("Liability [under § 1983] will not lie absent active unconstitutional behavior; failure to act or passive behavior is insufficient.").

Neither exception applies here. Plaintiffs do not allege that Ray or McCambridge had a legal duty to stop Martorello from continued enforcement of his newsbin policy, that they exerted any control over the decisions of the facilities department, or that their failure to intervene in the dispute between Plaintiffs and Martorello violated any law, statute, or even university requirement. This is not a case like *Preschooler II*, 479 F.3d at 1183, where there was a legal duty to report; or like *Starr*, 652 F.3d at 1208, where a statute imposed a duty to protect and to take corrective action; or even like *Bergquist v. Cnty. of Cochise*, 806 F.2d 1364, 1369-70 (9th Cir. 1986), *abrogated on other grounds by City of Canton v. Harris*, 489 U.S. 378 (1989), where failure to train or supervise amounted to a policy or custom of deliberate indifference. Nor do plaintiffs allege that either Ray and McCambridge personally took an action that deprived plaintiffs of their constitutional rights. Rather, the complaint indicates that Ray and McCambridge did not even know about the removal of *The Liberty*'s bins until after the fact, at which point Ray stated that the removal of the bins was "news" to him, and McCambridge told plaintiffs that Martorello would be the "point of contact" with respect to further inquiries. Nor does the complaint allege that either official developed or enforced the newsbin policy, which was promulgated by the facilities department, and enforced by Martorello. In sum, the complaint merely recites "the *organizational* role of the[ ] supervisors," and makes "no allegation that the supervisors took any specific action resulting in" the constitutional violation. *Moss v. U.S. Secret Serv. (Moss II)*, 675 F.3d 1213, 1231 (9th Cir. 2012) (emphasis in original). This is not sufficient to state a claim under § 1983.

The majority misses this central point because it focuses solely on one component of a § 1983 claim: the proper mental state for First Amendment claims. The majority's detailed and elaborate discussion of this issue, *see* Maj. op. at 12785-93, boils down to the simple, though erroneous, proposition that a plaintiff can adequately allege a § 1983 claim for violation of that plaintiff's First Amendment rights merely by alleging that the official had knowledge of such violation. The majority brushes aside § 1983's requirement that a defendant engage in conduct that "subjects, or causes to be subjected" a plaintiff to a deprivation of constitutional rights, and instead holds it suffices if a supervisory official "knowingly acquiesces" in the misconduct of a lower ranking employee. Maj. op. at 12793. But of course, "acquiescence" is merely a way to describe knowledge and inaction. *See Webster's Third New Int'l Dictionary* 18 (3d ed. 2002) (defining "acquiescence" as "passive assent or submission."). The word "acquiescence" adds nothing to the mental state of "knowledge" unless the official has a legal duty *not* to acquiesce. Further, the majority erroneously implies that an allegation of "knowledge" suffices to establish the causation element of a § 1983 claim, namely, that the official caused the plaintiff's injury. The majority relies on a novel and somewhat impenetrable formulation that "duty" is generally equivalent to acting with a specified state of mind, and this duty "eclipses" proximate cause where the plaintiff acts with knowledge that a violation may occur. Maj. op. at 12788-89 n.12. Because (in the majority's view) the mental state of knowledge stands in for both misconduct and causation, the plaintiffs can state a § 1983 claim by alleging only that a supervisor had knowledge of a subordinate's misconduct and took no action.

This is not enough. While plaintiffs here must plead the elements of a First Amendment violation, including mental state, they must also plead that each official acted in a way that "subject[ed], or cause[d] to be subjected," a citizen to the deprivation of First Amendment rights. 28 U.S.C. § 1983. Plaintiffs here did not allege that Ray or McCambridge

engaged in any misconduct or that these officials caused their injury. Therefore, the complaint in its current form does not meet the bare minimum for stating a First Amendment claim under § 1983 against Ray or McCambridge, and this claim must be dismissed.[1]

The majority reaches a contrary determination only because it smuggles respondeat superior back into our § 1983 jurisprudence. In place of personal misconduct and causation, the majority substitutes mere knowledge of a lower-ranking employee's misconduct. But this is the very standard *Iqbal* rejected, because it makes officials responsible for lower-ranking employees' misdeeds merely by virtue of the officials' positions in the organization. By adopting this standard, the majority returns us to pre-*Iqbal* jurisprudence and revives vicarious liability, at least for First Amendment claims. Because this is contrary to *Iqbal*'s ruling that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct," 556 U.S. at 677, I dissent.

---

[1]I would dismiss plaintiffs' equal protection claim against Ray and McCambridge on the same grounds. *See Iqbal*, 556 U.S. at 676.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2012 Thomson Reuters.